## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| M3 USA CORPORATION<br>  501 Office Center Drive Suite 410<br>  Fort Washington, PA 19034 | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
|         Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| SUMMER QAMOUM, | ) | |
|   9702 Terra Lago CT, Apt. 414 | ) | |
|   Rowlett, TX 75089 | ) | |
| | ) | |
| MEDICAL MILE REASEARCH LLC | ) | |
| DBA MEDICAL MILE RESEARCH | ) | |
|   3520 Jefferson Ave. SE | ) | |
|   Wyoming, MI 49548 | ) | |
| | ) | |
| ROBERT WARPAS, | ) | |
|   9702 Terra Lago CT, Apt. 414 | ) | |
|   Rowlett, TX 75089 | ) | |
| | ) | |
|         Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff M3 USA Corporation ("M3"), by and through its counsel, brings this action against individual Defendants Robert Warpas ("Warpas") and Summer Qamoum ("Qamoum") and corporate Defendant Medical Mile Reaserch LLC dba Medical Mile Research, hereby alleges as follows:

## <u>NATURE OF ACTION</u>

1.     This is an action arising from Warpas and Qamoum's former employment with M3, including the breach of their Proprietary Information and Inventions Agreements ("PIIAs"), and subsequent post-employment conduct, including Qamoum's misappropriation of M3's trade secrets and confidential information on behalf of Medical Mile.

**PARTIES**

2.      Plaintiff M3 USA Corporation is a corporation organized under the laws of the State of Delaware and maintains its principal place of business located in Commonwealth of Pennsylvania.  M3 was previously headquartered in Washington, D.C. until approximately 2016.

3.      Upon information and belief, Defendant Robert Warpas is a citizen and domiciliary of Texas.

4.      Upon information and belief, Defendant Summer Qamoum is a citizen and domiciliary of the State of Texas.

5.      Upon information and belief, Defendant Medical Mile Research is a corporation organized under the laws of the State of Michigan.

**JURISDICTION AND VENUE**

6.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, as this case arises under federal law and evokes a question of federal law.

7.      Count VI of the Complaint alleges violations of the Defend Trade Secrets Act, 18 U.S.C.A. § 1836.

8.      The Court has supplemental jurisdiction over all remaining counts under 28 U.S.C. § 1367, as the remaining claims in the remaining counts form part of the same case or controversy.

9.      In the alternative, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332. Complete diversity exists between the Parties as the Parties are citizens of different States. Furthermore, the amount in controversy exceeds the sum or value of $75,000.

10.      Venue is proper in the District Court of the District of Columbia under 28 U.S.C. § 1391, because the Parties expressly consented to the personal jurisdiction of the federal courts of the District of Columbia in any lawsuit arising from or related to their PIIAs and that the

agreement would be governed by, construed, and enforced in accordance with the laws of the District of Columbia.  PIIA ¶ 14.

## FACTS

11.    M3 provides market research recruitment, data collection, and support services primarily in the healthcare space in the US, Europe, and Asia, primarily doing business as M3 Global Research.

12.    Panels of providers who participate in market research surveys are M3's primary asset in the market research business.

13.    M3 works with health care professionals and invites health care professionals to participate in surveys and interviews.  M3 provides research to market research agencies and pharmaceutical companies.

14.    Among other services, M3 provides qualitative and quantitative research, provides recruitment services for healthcare providers, patients, caregivers, and consumers, as well as data collection, face-to-face, telephone, and online surveys.  M3 creates and maintains relationships and panels of patients, caregivers, and general consumers.

15.    Market research in the healthcare space is a highly competitive industry, with high employee turnover between companies competing over the same clients and customers.

16.    M3 invests considerable time and expense into developing its lists of research panels of healthcare providers and its contact database, which are not generally known or publicly available.

17.    Most providers' contact details, such as email addresses, are not publicly available online.  Although some providers' contact details are available publicly online through their

practices or American Medical Association listings, only a very small percentage of providers actively participate in market research.

18.    Therefore, there is substantial value in identifying panel members who actively participate in market research and M3's list of providers and their contact information is of substantial value because it is not generally known to the public or its competitors.

19.    Likewise, M3's client lists include email addresses of contacts which are not publicly available and are valuable assets to M3.

20.    Although public lists of healthcare providers may be purchased from various sources for market research, such lists are expensive and there is significant value in verified and curated lists of providers who actively participate in market research studies.

21.    M3 takes reasonable protective measures to protect its panel members, clients contacts, and associated contact information in its Market Research system, including extensive, multi-level security protocols.

22.    M3 hired Warpas as an Account Manager – Market Research or around March 11, 2013.

23.    On March 8, 2013, Warpas signed an offer letter acknowledging that as a condition of M3's offer of employment he "will be required to sign M3's standard Proprietary Information and Inventions Agreement."

24.    On March 8, 2013, Warpas voluntarily executed the PIIA.

25.    The PIIA, executed between M3 and Warpas, contained a Non-Compete Covenant, which stated in relevant part:

> During [Warpas'] employment with the Company and for a period of *one year* (12 months) immediately following termination of [his] employment with the Company for whatever reason, Employee shall not . . . (ii) be employed by or serve as an employee for any competitor of the Company

> providing the same or similar product or services for any customer or client of the Company for whom the Employee provided such services pursuant to this Agreement.

PIIA ¶ 7 (emphasis in original).

26.     The PIIA limited the geographic scope of the non-compete covenant to the United States, or any country where the Employee performed services, which Warpas acknowledged as "reasonably necessary to protect the Company's business interests."  PIIA ¶ 8.

27.     The PIIA contained a tolling provision, which states that "the time period of the prohibition in this Section shall be extended by any period of violation plus any period of time required for the Company to obtain enforcement of the terms of this Section."  PIIA ¶ 7.

28.     By signing the PIIA, Warpas acknowledged that his obligations shall survive the termination of his employment with M3.  *See* PIIA ¶ 9.

29.     By signing the PIIA, Warpas acknowledged that "any breach of the [Non-Compete Covenant] will cause irreparable harm to the Company for which damages would not be an adequate remedy."  PIIA ¶¶ 7 & 11.

30.     The PIIA provides that in the event of actual or threatened breach of any provision of the Agreement, "the Company shall be entitled, without positing bond, to injunctive relief restraining [Warpas] from violating its provisions or to compel Employee to perform in accordance with its provisions."  PIIA ¶ 11.

31.     The PIIA also provides for attorneys' fees and costs incurred in obtaining injunctive or any other relief in any lawsuit relating to the PIIA.  PIIA ¶ 11.

32.     The PIIA states that it is severable and "if any provision or portion of a provision in the Agreement is determined to be invalid, void or unenforceable to any extent, the remaining provisions or portions thereof shall remain fully valid and enforceable."  PIIA ¶ 13.

33.     During Warpas' employment with M3, he was promoted to Vice President of Market Research Sales on January 1, 2016, and to Senior Vice President on May 16, 2019.

34.     As a Senior Vice President of Market Research Sales, Warpas' job functions and responsibilities included:  managing the Market Research Sales team to ensure it achieved its sales quotas; participating in client-facing phone calls; helping contribute strategies for success with the Global Sales Leadership team; maintaining personal relationships with existing clients and developing new business.

35.     During Warpas' employment with M3, M3 provided him with access to confidential and proprietary information not available to the public and developed as a result of significant time and expense of M3, such as customer lists, products, services, pricing, costs, profits, sales, marketing and business plans, budgets, forecasts, non-public financial information, client requirements, internally developed methods of customer solicitation, information assembled relating to existing and prospective customers, arrangements with customers and suppliers, market or market extensions, trade secrets, processes, know-how, methods of operation, software, and documentation.

36.     On or around August 8, 2016, M3 hired Qamoum as a Qualitative Project Manager.

37.     On July 14, 2016, Qamoum signed an offer letter acknowledging that as a condition of M3's offer of employment she will be required to complete the Non-compete and Non-Solicitation Provision of the PIIA.

38.     On July 20, 2016, Qamoum signed the PIIA, which had almost identical language as the PIIA that Warpas signed, including a covenant not to be employed by or serve as an employee to any "competitor of [M3] providing the same or similar product or services for any customer or client of [M3] for whom [Qamoum] provided any such services pursuant to this

Agreement" in the restricted territory for a period of one year following termination of her employment.  *See* PIIA ¶ 7.

39.     The PIIA contained a Duty of Loyalty clause in which Qamoum agreed that during the period of her employment, she would not, without the Compay's written consent, "engage in any business activity other than for the Company, including but not limited to employment or business activity which is competitive with, or would otherwise conflict with, [her] employment by the Company."  PIIA ¶ 2.

40.     The PIIA also contained a Confidentiality clause in which in which Qamoum agreed that all Confidential Information (including information related to M3's clients) was the exclusive property of M3 and she would not use M3's Confidential Information or copy Confidential Information without a valid purpose directly related to her responsibilities in connection with M3's business.  PIIA ¶ 4.

41.     Furthermore, pursuant to the PIIA, Qamoum agreed that during her employment and for a period of one year after, she would not:

> directly or indirectly call on, solicit, or take away, or attempt to call on, solicit, or take way, or provide services to any of the customers or clients of the Company on whom [Qamoum] called, performed services for, or became acquainted with or aware of, during the term of [her] employment with the Company . . ."

PIIA ¶ 5.

42.     The Non-Solicitation Covenant contained a tolling provision that the time period of the prohibition would be extended by any period of violation plus any period of time required for M3 to obtain enforcement of the terms of the provisions.  *See* PIIA ¶ 5.

43.     During Qamoum's employment with M3, she was promoted to Qualitative Project Manager II on June 16, 2019.

44.     As a Qualitative Project Manager II, Qamoum's job functions and responsibilities included managing multiple studies focused on qualitative research; overseeing set up and testing of survey/screener, monitoring of statistics, managing respondent honoraria and closing/auditing/invoicing of projects in technology-based system; and managing and leverage relationships with vendors, domestic and international, to facilitate accurate and timely deliverables, communications, and issue resolution; managing study profitability by monitoring and accounting for all project costs affecting the budget; and Provide guidance and mentoring to members of the Market Research Project Management team as needed.

45.     During her employment with M3, M3 provided Qamoum with access to confidential and proprietary information not available to the public and developed as a result of significant time and expense of M3, such as customer lists, products, services, pricing, costs, profits, sales, marketing and business plans, budgets, forecasts, non-public financial information, client requirements, internally developed methods of customer solicitation, information assembled relating to existing and prospective customers, arrangements with customers and suppliers, market or market extensions, trade secrets, processes, know-how, methods of operation, software, and documentation.

46.     On July 25, 2019, M3 terminated Warpas' employment.

47.     On August 22, 2019 (approximately one month after Warpas' employment termination from M3 and prior to Qamoum's resignation from M3), Jamal Qamoum registered a limited liability company in the State of Michigan named Medical Mile Reasearch[1] LLC ("Medical Mile").

---

[1]  The name is mis-spelled in the state registration.  The company goes by the name "Medical Mile Research."

48.     Upon information and belief, Warpas and Qamoum are co-founders, employees, and agents of Medical Mile.

49.     According to Medical Mile's website, it is a "Primary Market Research Recruitment Firm specializing in the Healthcare, Pharmaceutical and Biotech Industries" that "provides fielding solutions for the healthcare primary market research industry." The website claims the company "specializ[es] in Qualitative and Quantitative Primary Research recruitment."

50.     Medical Mile was, and upon information and belief is still currently, operating in direct competition with M3 in the same industry for the same clients and panel members as M3.

51.     On September 3, 2019, Qamoum resigned her position with M3.

52.     On the last two days of her employment with M3, including late in the day on her last day, M3 logged unusually heavy activity by her user ID on two pages of the Market Research system within which M3 manages all its projects.

53.     In combination, these two pages would have allowed a Qamoum to search for and extract M3's panel member details, including names, emails addresses, and phone numbers, as well as other project details.

54.     Qamoum did not have a legitimate work purpose to access these pages within the Market Research system on her last day, as she did.

55.     Upon information and belief, Qamoum captured the information in the records with the intent of using the information to benefit herself and Medical Mile with the intention of using the information to compete with M3.

56.     Upon information and belief, Qamoum, as an agent of Medical Mile, either used or disclosed M3's panel information for the purpose of soliciting M3's panel members.

57.     Medical Mile has been soliciting M3's panel members since as early as April 16, 2020, sending invitations to members of M3's panel to participate in online surveys on topics related to healthcare.  At least one recipient of a solicitation to participate in Medical Mile's survey has been working exclusively with M3 and has not signed up for any other studies.  Therefore, there is a high probability that the contact information for this panel member was misappropriated from M3's database.

58.     On May 28, 2020, Qamoum sent a direct solicitation email to a current M3 client.

59.     In the solicitation email, Qamoum explicitly referenced that their "paths my[*sic*] have crossed during [Qamoum's] time at M3 and [she was] hoping to reconnect.  [Qamoum] recently helped co-launch a healthcare panel, offering access to deep respondent profiling across daily functions, management responsibilities, and treatment/work settings."

60.     The client indicated that Qamoum had "blasted [the solicitation email] to about a dozen people" at the company.

61.     After learning about Qamoum's solicitation of its clients, on June 3, 2020, M3, via its counsel, sent a cease and desist letter to Qamoum and Warpas notifying them that they were in breach of their PIIA by operating a competitive business in violation of their covenant not to compete and their covenant not to solicit M3's panel members and clients.

62.     M3 also demanded that Defendants immediately return any of M3's confidential and proprietary information improperly accessed or obtained in the Market Research system in violation of the PIIA.

63.     In response, Defendants communicated to M3 their refusal to cease their competitive activities, including their refusal to stop soliciting M3's clients and panel members.

64.     To date, Qamoum has not returned any Confidential Information improperly accessed or obtained from M3's Market Research system.

65.     The Parties attempted to resolve the matter without the need for litigation, however, the Parties' negotiations broke down on September 16, 2020.

## CLAIMS FOR RELIEF

### Count One – Breach Of Contract (Warpas)

66.     M3 incorporates by reference paragraphs 1 through 65 above, as if fully set forth herein.

67.     The PIIA is a valid contract that is binding upon Warpas and is supported by mutual consideration.

68.     M3 performed all of its material obligations under the PIIA.

69.     The covenant restricting competition with M3 during Warpas' employment and for one year after the termination of his employment within the restricted territory (Section 7 of the PIIA) was reasonable to protect M3's legitimate business interests.

70.     Warpas breached, is breaching, and is threatening to continue to breach Section 7 of the PIIA by co-founding Medical Mile and being employed by an entity that provides the same or similar services to M3 clients as provided by M3 within the restricted time period and within the restricted territory of the non-competition clause of the PIIA.

71.     Warpas' continuing breach of Section 7 of the PIIA triggered the tolling provision, which extends the restricted time period of the covenant by any period of violation plus any period of time required for M3 to obtain enforcement of the terms of the non-compete.

72.     As a direct and proximate result of the foregoing acts, M3 has suffered and continues to suffer harm to its competitive position, its economic expectancies, and damages as a

result of Warpas' breach of contract and has been forced to incur, and will continue to incur, significant attorneys' fees to enforce the PIIA.

73.     As a result of Warpas' breach of the PIIA, M3 has been damages in an amount to be determined at trial.

74.     Unless restrained by this Court, the continuing wrongful actions of Warpas, as detailed above, will continue to cause irreparable harm to M3 for which there is no adequate remedy at law.  M3 is therefore entitled to entry of preliminary and permanent injunctive relief prohibiting Warpas from continuing to violate the PIIA.

**Count Two – Breach Of Contract (Qamoum)**

75.     M3 incorporates by reference paragraphs 1 through 74 above, as if fully set forth herein.

76.     The PIIA is a valid contract that is binding upon Qamoum and is supported by mutual consideration.

77.     M3 performed all of its material obligations under the PIIA.

78.     The Duty of Loyalty During Employment clause of the PIIA (Section 2 of the PIIA), codified Qamoum's fiduciary duty of loyalty to M3 and the expectation to protect M3's legitimate business interests while she was an employee at M3.

79.     The covenant restricting competition with M3 during Qamoum's employment and for one year after the termination of Qamoum's employment within the restricted territory (Section 7 of the PIIA) was reasonable in scope to protect M3's legitimate business interests.

80.     The covenant restricting solicitation of M3's clients and customers for one year after the termination of Qamoum's employment (Section 5 of the PIIA) was reasonable in scope to protect M3's legitimate business interests.

81.     The Proprietary Information and Confidentiality clauses (Sections 3 and 4 of the PIIA) were reasonable to protect M3's confidential and proprietary information and necessary to protect M3's legitimate business interests.

82.     Qamoum breached, is breaching, and threatening to continue to breach the PIIA by:

(a)     co-founding Medical Mile and being employed by an entity that provides the same or similar services to M3 clients as provided by M3 within the restricted time period and within the restricted territory of the non-competition clause of the PIIA;

(b)     directly soliciting M3's current clients and panel members within the restricted time period of the non-solicitation clause of the PIIA;

(c)     misappropriating and misusing M3's confidential, proprietary, and trade secret information; and

(d)     misappropriating and misusing M3's confidential, proprietary, and trade secret information to compete with M3 during her employment with M3.

83.     Qamoum's breach of the PIIA triggered the tolling provisions of Section 5 and Section 7 of the PIIA, which extend the restricted time period of the covenants by any period of violation plus any period of time required for M3 to obtain enforcement of the terms of the Sections.

84.     As a direct and proximate result of the foregoing acts, M3 has suffered and continues to suffer harm to its competitive position, its economic expectancies, and damages as a result of Qamoum's breach of the PIIA and has been forced to incur, and will continue to incur, significant attorneys' fees to enforce the PIIA.

85.     As a result of Qamoum's breach of the PIIA, M3 has been damages in an amount to be determined at trial.

86.     Unless restrained by this Court, the continuing wrongful actions of Qamoum, as detailed above, will continue to cause irreparable harm to M3 for which there is no adequate remedy at law.  M3 is therefore entitled to entry of preliminary and permanent injunctive relief prohibiting Qamoum from continuing to violate the PIIA.

**Count Three -  Breach Of Fiduciary Duty Of Loyalty (Qamoum)**

87.     M3 incorporates by reference paragraphs 1 through 86 above, as if fully set forth herein.

88.     As an employee of M3 with access to trade secrets and confidential and proprietary information, Qamoum owed a fiduciary duty of good faith and loyalty to M3 in the performance of her duties.

89.     Upon information and belief, Qamoum willfully and maliciously breached her fiduciary duty by misusing her access to the Market Research system to misappropriate M3's confidential proprietary information and trade secrets with the intention to use them to compete against M3 without its authorization or consent.

90.     As a direct and proximate result of Qamoum's breach of her fiduciary duty of loyalty, M3 suffered damages, including its competitive position, its economic expectancies, and damages in an amount to be determined at trial.

91.     Upon information and belief, Qamoum's breach of her fiduciary duties occurred with actual malice toward M3 or with recklessness or negligence to M3's rights, entitling M3 to punitive damages.

**Count Four -  Unjust Enrichment (Qamoum and Medical Mile Only)**

92.     M3 incorporates by reference paragraphs 1 through 91 above, as if fully set forth herein.

93.     Qamoum's wrongful use of M3's confidential information, as an agent of Medical Mile, has given Qamoum and Medical Mile innumerable benefits without the time, effort, and expense of acquiring and developing the same.

94.     Qamoum used and is using M3's confidential information to the competitive disadvantage of M3.

95.     Qamoum's conduct, as described herein, constitutes unfair competition, and has unjustly enriched Qamoum and Medical Mile at M3's expense.

96.     As a direct result of such conduct, M3 has suffered and will continue to suffer substantial damages and irreparable harm and loss.

**Count Five - Misappropriation of Confidential Information (Qamoum and Medical Mile Only)**

97.     M3 incorporates by reference paragraphs 1 through 96 above, as if fully set forth herein.

98.     M3 maintains a common law right to the protection of its confidential business information.

99.     Qamoum was aware of her duty to maintain the confidentiality of M3's confidential and proprietary information.

100.     Qamoum had access to, and remains in the possession of, M3's confidential and proprietary business information and her wrongful use of same as described herein constitutes misappropriation of confidential information.

101.     Qamoum's willful, wrongful, and malicious misuse of M3's confidential and proprietary business information has harmed M3, and deprived M3 of the exclusive use of this information.

102.   Qamoum's position with Medical Mile will also inevitably cause her to use and disclose M3's confidential and proprietary information to compete in the same competitive space.

103.   The disclosure and continued use of such competitively sensitive and confidential information has caused and will continue to cause M3 irreparable harm and substantial damages.

**Count Six -  Violation of Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836 *et seq*. (Qamoum and Medical Mile Only)**

104.   M3 incorporates by reference paragraphs 1 through 103 above, as if fully set forth herein.

105.   M3 owns lists of actual and potential panel members for various market research studies and accompanying details such as names, email, phone number, and other details of actual and potential providers, which meet the definition of a trade secret under 18 U.S.C. § 1839(3).

106.   M3's lists of actual and potential panel member and associated contact details is a compilation that derives actual and potential economic value from the fact that this information is not generally known to the public and is not readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

107.   M3 took reasonable measures to protect such information secret, including, but not limited to, password protecting access to the Market Research system and requiring all employees, or other with access to the Market Research system, to sign PIIAs or non-disclosure agreements.

108.   Qamoum misappropriated M3's panel list acquiring M3's panel list by improper means, including by breaching her duty to maintain secrecy and misusing her M3 Market Research system login credentials, and without M3's consent or permission.

109.   Qamoum further misappropriated M3's panel list by using and/or disclosing M3's panel information without its consent to solicit M3's panel members on behalf of Medical Mile.

110.     Qamoum, as an agent of Medical Mile, used and/or disclosed M3's panel information with knowledge that she acquired the panel information under circumstances giving rise to a duty to maintain the secrecy of the panel information under her duty of loyalty to M3 and the contractual provisions of the PIIA.

111.     Qamoum and Medical Mile's misappropriation of M3's trade secrets rises to the level of willful and malicious, without justification or excuse, and Qamoum and Medical Mile knew that Qamoum's misconduct would harm and interfere with M3's economic and competitive advantage.

112.     Qamoum and Medical Mile have materially harmed and damaged M3 by their misappropriation of M3's trade secrets.

113.     As a result of such actions by Qamoum and Medical Mile, M3 is entitled to injunctive relief, reasonable royalty for the unauthorized use of its trade secret, exemplary damages, reasonable attorneys' fees, and costs.

**Count Seven -   Violation of District of Columbia Uniform Trade Secrets Act (DCUTSA), D.C. Code § 36-401 (Qamoum and Medical Mile Only)**

114.     M3 incorporates by reference paragraphs 1 through 113 above, as if fully set forth herein.

115.     M3 owns lists of actual and potential panel members for various market research studies and accompanying details such as names, email, phone number, and other details of actual and potential providers, which meet the definition of a trade secret under D.C. Code § 36-401(4).

116.     M3's lists of actual and potential panel member and associated contact details is a compilation that derives actual and potential economic value from the fact that this information is not generally known to the public and is not readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

117.   M3 took reasonable measures to protect such information secret, including, but not limited to, password protecting access to the Market Research system and requiring all employees, or other with access to the Market Research system, to sign PIIAs or non-disclosure agreements.

118.   Qamoum misappropriated M3's panel list acquiring M3's panel list by improper means, including by breaching her duty to maintain secrecy and misusing her M3 Market Research system login credentials, and without M3's consent or permission.

119.   Qamoum further misappropriated M3's panel list by using and/or disclosing M3's panel information without its consent to solicit M3's panel members on behalf of Medical Mile.

120.   Qamoum, as an agent of Medical Mile, used and/or disclosed M3's panel information with knowledge that she acquired the panel information under circumstances giving rise to a duty to maintain the secrecy of the panel information under her duty of loyalty to M3 and the contractual provisions of the PIIA.

121.   Qamoum and Medical Mile's misappropriation of M3's trade secrets rises to the level of willful and malicious, without justification or excuse, and Qamoum and Medical Mile knew that Qamoum's misconduct would harm and interfere with M3's economic and competitive advantage.

122.   Qamoum and Medical Mile have materially harmed and damaged M3 by their misappropriation of M3's trade secrets.

123.   As a result of such actions by Qamoum and Medical Mile, M3 is entitled to injunctive relief, reasonably royalty for the unauthorized use of its trade secret, exemplary damages, reasonable attorneys' fees, and costs.

**Count Six -  Preliminary and Permanent Injunction – All Defendants**

124.    M3 incorporates by reference paragraphs 1 through 123 above, as if fully set forth herein.

125.    Defendants have engaged in breach of contract, breach of fiduciary duty, and other wrongful and tortious acts as alleged above.

126.    The continued misuse of M3's confidential and proprietary business information, unfair competition, and solicitation of M3's panel members will cause irreparable harm to M3 for which there is no adequate remedy at law.

127.    Unless restrained, Defendants will continue to misuse M3's confidential and proprietary business information, unfairly compete with, and solicit M3's clients and panel members in violation of their respective agreements and fiduciary duties.

128.    The irreparable harm that would be suffered by M3 if the injunction is not granted outweighs the harm to be suffered by Defendants if an injunction is granted.

129.    An injunction would not substantially injure any other interested parties.

130.    The public interest would be furthered by an injunction to enforce a valid contract between the Parties and protect confidential and proprietary information and trade secrets, which is necessary for free and fair competition.

131.    M3 is likely to prevail on the merits.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants jointly and severally as follows:

1)    That Defendants be ordered preliminarily and permanently to return to M3 all confidential and proprietary information, including trade secrets, in their possession or control;

2)      That Defendants be preliminarily and permanently enjoined from using, transmitting, or disclosing any of M3's trade secret or confidential and proprietary information including, but not limited to, any and all M3 panel member information;

3)      That Defendants be ordered to disclose the names and addresses of any and all persons to whom they have disclosed M3's confidential and proprietary information, including, but not limited to, any and all of M3's panel member information;

4)      That Qamoum be enjoined from employment by Medical Mile or any business in the United States that provides healthcare or pharmaceutical market research for any customer or client of M3 for whom she provided any such services at M3 for a period of twelve (12) months from the date of this Court's order;

5)      That Warpas be enjoined from employment by Medical Mile or any business in the United States that provides the healthcare or pharmaceutical market research for any customer or client of M3 for whom he provided any such services at M3 for a period of eleven (11) months from the date of this Court's order;

6)      That Defendants and their agents be enjoined from soliciting, servicing, or otherwise having business contact with M3's panel members for the purpose of providing products or services that Defendants were involved in providing during their employment with M3 for a period of twelve (12) months from the date of the Court's order;

7)      That Defendants submit to expedited discovery, including forensic examination of their computers, cell phones and other electronic devices;

8)      That Defendants be ordered to disgorge any profits, monetary compensation or non-monetary compensation received as a result of the unlawful conduct set forth above;

9)      That M3 be awarded compensatory damages in an amount to be determined at trial;

10)     That M3 be awarded punitive damages in an amount to be determined at trial;

11)     That M3 be awarded exemplary damages in an amount to be determined at trial;

12)     That M3 be awarded a reasonable royalty in an amount to be determined at trial;

13)     That M3 be awarded prejudgment and post-judgment interest;

14)     That M3 be awarded its reasonable attorneys' fees and costs;

15)     That M3 be awarded such other and further necessary and proper relief as the Court may deem just and proper.


**[THE REMAINDER OF THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK.]**

Dated:  October 9, 2020                         /s/ Eric A. Welter
                                                Eric A. Welter (D.C. Bar No. 440223)
                                                **WELTER LAW FIRM, P.C.**
                                                20130 Lakeview Center Plaza, Suite 400
                                                Ashburn, VA 20147
                                                (703) 435-8500
                                                (703) 435-8851 (fax)
                                                eaw@welterlaw.com
                                                *Attorneys for Plaintiff*