**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| M3 USA CORPORATION, | |
| *Plaintiff*, | |
| v. | Civil Action No. 20-2903 (RDM) |
| SUMMER QAMOUM, *et al.*, | |
| *Defendants*. | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff M3 USA Corporation ("M3") brings this action against two of its former employees, Summer Qamoum and Robert Warpas, and Medical Mile Research, LLC ("Medical Mile"), a company that now employs Qamoum and Warpas.  M3 alleges that Qamoum and Warpas have breached, and are continuing to breach, their non-compete agreements with M3; that Qamoum breached her contractual and common law duties of loyalty to M3 and has violated, and is continuing to violate, her non-solicitation agreement with M3; and that Qamoum and Medical Mile are being unjustly enriched through the wrongful use of M3's confidential business information, are misappropriating M3's confidential business information, and are violating the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.*, and the District of Columbia Uniform Trade Secrets Act, D.C. Code. § 36-401.  Dkt. 1 at 11–18 (Compl. ¶¶ 66–123).  Pending before the Court are two motions: (1) Medical Mile's motion to dismiss the action against it for lack of personal jurisdiction, Dkt. 10, and (2) M3's motion for a preliminary injunction, seeking to enjoin Qamoum and Warpas "from further violating" their contracts, Dkt. 24 at 3.

For the reasons explained below, the Court will **GRANT** Medical Mile's motion to dismiss without prejudice and will **DENY** M3's motion for a preliminary injunction.

## I.  BACKGROUND

**A.   Factual Background**

1.   *Warpas's and Qamoum's Employment with M3*

For purposes of resolving the pending motions, the Court relies on the uncontested allegations in the complaint, the declarations, deposition testimony, and customer lists that the parties have proffered, and the testimony of Warpas, Qamoum, and her father from the hearing on the pending motions.  *See Doe v. U.S. Customs & Border Prot.*, No. 20-cv-672, 2021 WL 980888, at *4 (D.D.C. Mar. 16, 2021) (quoting *Clay v. Blue Hackle N. Am., LLC*, 907 F. Supp. 2d 85, 87 (D.D.C. 2012)) (when evaluating a motion to dismiss for lack of personal jurisdiction, a court "may receive and weigh affidavits and any other relevant matter to assist it in determining the . . . facts"); *Cobell v. Norton*, 391 F.3d 251, 260–62 (D.C. Cir. 2004) (noting that courts should rely on declarations and, if necessary, an evidentiary hearing to resolve a motion for a preliminary injunction).

Plaintiff M3 USA Corporation is a Delaware corporation with its principal place of business in Pennsylvania.  Dkt. 1 at 2 (Compl. ¶ 2).  The company "is a leading provider of market research recruitment, data collection, and support services primarily in the healthcare space in the United States, Europe, and Asia, primarily doing business as M3 Global Research."  Dkt. 24-2 at 3 (Lamitina Decl. ¶ 7).  It "conducts healthcare market research, primarily for market research agencies and pharmaceutical companies, by recruiting panels of healthcare professionals, patients, caregivers and consumers to participate in surveys and interviews for compensation."  *Id.* (Lamitina Decl. ¶ 8).  "M3 acquires survey taker contact information by

2

buying contact[] lists from third party data vendors, cold calling, and internet research," among other techniques.  Dkt. 25-1 at 7; *see also* Dkt. 25-2 at 2–4 (Richter Dep. 16:9–18:17).  "Market research in the healthcare space is a highly competitive industry, with high employee turnover between companies competing over the same clients and customers."  Dkt 24-2 at 3 (Lamitina Decl. ¶ 9).

On or about March 11, 2013, M3 hired Defendant Robert Warpas as an account manager. *Id.* at 4 (Compl. ¶ 22); Dkt. 11 at 3 (Ans. ¶ 22).  Warpas, who had "worked in the online survey industry for years prior to working for M3," Dkt. 25-1 at 7; *see also* Dkt. 25-4 at 3 (Warpas Decl. ¶ 3), eventually became a "Vice President of Market Research Sales on January 1, 2016" and "Senior Vice President on May 16, 2019" at M3.  Dkt. 1 at 6 (Compl. ¶ 33); Dkt. 11 at 4 (Ans. ¶ 33).  His duties included "managing the Market Research Sales team to ensure it achieved its sales quotas; participating in client-facing phone calls; helping contribute strategies for success with the Global Sales Leadership team; maintaining personal relationships with existing clients[;] and developing new business."  Dkt. 1 at 6 (Compl. ¶ 34); Dkt. 11 at 4 (Ans. ¶ 34).

On or about August 8, 2016, M3 hired Summer Qamoum "as a Qualitative Project Manager," and she was eventually promoted to "Qualitative Project Manager II."  Dkt. 1 at 6–7 (Compl. ¶¶ 36, 43); Dkt. 11 at 4–5 (Ans. ¶¶ 36, 43).  Prior to joining M3, Qamoum had worked in the market research industry for 2-1/2 years "as a project manager and assistant director of operations."  Dkt. 25-4 at 2 (Qamoum Decl. ¶ 3).  Qamoum's responsibilities at M3 included "managing multiple studies focused on qualitative research; overseeing set up and testing of survey[s]/screener[s][;] monitoring . . . statistics[;] managing respondent honoraria and closing/auditing/invoicing of projects in [a] technology-based system; . . . managing and leverag[ing] relationships with vendors, domestic and international, to facilitate accurate and

timely deliverables, communications, and issue resolution; managing study profitability by monitoring and accounting for all project costs affecting the budget; and [p]rovid[ing] guidance and mentoring to members of the Market Research Project Management team."  Dkt. 1 at 8 (Compl. ¶ 44); Dkt. 11 at 5 (Ans. ¶ 44).

As part of their jobs—managing market research sales and managing research, respectively, Dkt. 1 at 6, 8 (Compl. ¶¶ 34, 44)—Warpas and Qamoum had "access to confidential and proprietary information . . . such as customer lists, products, services, pricing, costs, profits, sales, marketing and business plans, budgets, forecasts, non-public financial information, client requirements, internally developed methods of customer solicitation, information assembled relating to existing and prospective customers, arrangements with customers and suppliers, market or market extensions, trade secrets, processes, know-how, methods of operation, software, and documentation."  *Id.* at 6, 8 (Compl. ¶¶ 35, 45); Dkt. 11 at 4–5 (Ans. ¶¶ 35, 45); Dkt. 24-1 at 8–10.

Before beginning work at M3, both Warpas and Qamoum signed the company's "standard Proprietary Information and Inventions Agreement" ("PIIA"), which contained several covenants relevant to this case.  Dkt. 1 at 4, 6 (Compl. ¶¶ 23, 25, 38).  The contracts that they signed are not identical in every respect, but the relevant provisions are the same.  Both employees agreed with M3 (referred to as "the Company") to the following:

> **Confidentiality.**  The Company has and will develop, assemble, and own certain confidential Proprietary Information that has great value in its business ("Confidential Information"). . . .  Confidential Information shall include all forms of information relating either to the Company, or any of its clients or potential clients, learned by Employee during the term of this Agreement that is not generally known by or available to the public. . . .
>
> Employee agrees to hold, both during this Agreement and after the termination of his/her employment, Confidential Information in strict confidence and trust. Employee shall not disclose, in whole or in part, such Confidential Information,

either during this Agreement or after the termination of his/her employment, to any person, firm, corporation, association or other entity for any reason or purpose whatsoever except as reasonably necessary for the performance of Employee's obligations under this Agreement . . . .

Employee further agrees not to copy Confidential Information or remove Confidential Information from the Company's premises without a valid purpose directly related to Employee's responsibilities in connection with the business of the Company.

Dkt. 13-2 at 4 (Warpas PIIA § 4); Dkt. 13-3 at 4 (Qamoum PIIA § 4).  Both contracts included appendices identifying M3's "[c]ustomer list and all information contained in customer/company records" as the types of trade secrets covered by the PIIAs.  Dkt. 13-2 at 8 (Warpas PIIA Appendix A); Dkt. 13-3 at 8 (Qamoum PIIA Appendix A).

Warpas and Qamoum also agreed to a non-solicitation covenant, which provided as follows:

**Non-Solicitation Covenant.**  During his/her employment with the Company and for a period of one year (12 months) immediately following termination of his/her employment with the Company for whatever reason, Employee shall not, either directly or indirectly, call on, solicit, or take away, or attempt to call on, solicit, or take away, or provide services to any of the customers or clients of the Company on whom Employee called, performed services for, or became acquainted with or aware of, during the term of his/her employment with the Company, either for Employee's own benefit, or for the benefit of any other person or entity.  The time period of the prohibition in this Section shall be extended by any period of violation plus any period of time required for the Company to obtain enforcement of the terms of this Section. . . . Employee acknowledges and agrees that the period and parameters of this Section are reasonable and necessary to protect the Company's legitimate protectable business interests.

Dkt. 13-2 at 5 (Warpas PIIA § 5) (emphasis omitted); Dkt. 13-3 at 5 (Qamoum PIIA § 5) (same).

Finally, Warpas and Qamoum agreed to comply with M3's standard non-compete covenant, which provided as follows:

> **Non-Compete Covenant.** During his/her employment with the Company and for a period of one year (12 months) immediately following termination of his/her employment with the Company for whatever reason, Employee shall not . . . be employed by or serve as an employee to a competitor of the Company providing the same or similar product or services for any customer or client of the Company for whom the Employee provided any such services pursuant to this Agreement. The time period of the prohibition . . . shall be extended by any period of violation plus any period of time required for the Company to obtain enforcement of the terms of this Section.

Dkt. 13-2 at 5 (Warpas PIIA § 7) (emphasis omitted); Dkt. 13-3 at 5 (Qamoum PIIA § 7) (same).

The confidentiality, non-solicitation, and non-compete covenants each contained an acknowledgment by the signatory that breach would constitute an "irreparable harm to" M3, for which damages would not be an adequate remedy. Dkt. 13-2 at 4–5 (Warpas PIIA §§ 4–5, 7); Dkt. 13-3 at 4–5 (Qamoum PIIA §§ 4–5, 7).

In addition to these covenants, both contracts shared several other relevant provisions. Notably, they established a geographic scope contingent on the work performed by the signing employee, providing that "[i]nasmuch as [the] [e]mployee [would] be servicing the Company's customers/clients throughout the United States," the covenants would apply to customers and competitors anywhere in the United States, and would apply internationally to the extent that the employee provided international services while working at M3. Dkt. 13-2 at 5–6 (Warpas PIIA § 8); Dkt. 13-3 at 6 (Qamoum PIIA § 8). The geographic scope clause also stated that the "[e]mployee agree[d] that the scope of these restrictions [was] reasonably necessary to protect the Company's business." Dkt. 13-2 at 5–6 (Warpas PIIA § 8); Dkt. 13-3 at 6 (Qamoum PIIA § 8). Both PIIAs also contained a "Duty of Loyalty" clause that barred the signatory from "engag[ing] in any employment or business activity other than for" M3 while the signatory remained an M3 employee. Dkt. 13-2 at 2 (Warpas PIIA § 2); Dkt. 13-3 at 2 (Qamoum PIIA § 2).

Finally, of particular relevance to Medical Mile's motion to dismiss, both Warpas and Qamoum consented "to the personal jurisdiction of the state and federal courts for the District of Columbia [where M3 was headquartered at the time] in any lawsuit arising from or related to" their covenants in the PIIAs.  Dkt. 13-2 at 6 (Warpas PIIA § 14); 13-3 at 7 (Qamoum PIIA § 15); Dkt. 1 at 2 (Compl. ¶ 2).

 2.  *Break with M3 and Establishment of Medical Mile*

"On July 25, 2019, M3 terminated Warpas'[s] employment."  Dkt. 1 at 8 (Compl. ¶ 46); Dkt. 11 at 5 (Ans. ¶ 46).  Less than a month later, on August 22, 2019, Qamoum's father, Jamal Qamoum, registered a limited liability company also specializing in market research for the healthcare industry in Michigan under the name "Medical Mile Research LLC."  Dkt. 1. at 8–9 (Compl. ¶¶ 47, 49); Dkt. 11 at 5 (Ans. ¶¶ 47, 49); *see also* Dkt. 1 at 8 n.1 (noting that the registration contained a typographical error, referring to "Medical Mile Reasearch LLC"); Dkt. 22 at 3.

From the beginning, Medical Mile was a family venture.  As noted, Jamal Qamoum is Qamoum's father.  Dkt. 1 at 8 (Compl. ¶ 47); Dkt. 22 at 3; Dkt. 34 at 9 (Jamal Qamoum).  Jamal, who lives in Grand Rapids, Michigan, describes himself as "an entrepreneurial person" with multiple businesses.  Dkt. 34 at  7–8 (Jamal Qamoum).  Qamoum and her father frequently discussed starting their "own business," and, as a result of those conversations and after Qamoum had "started working in th[e] field," Jamal Qamoum focused on the idea of starting a market research company.  *Id.* at 9.

After Warpas's termination from M3, Jamal Qamoum and Warpas spoke about "the opportunity [to] . . . start[] something small," and together they decided to open Medical Mile. Dkt. 34 at 43 (Warpas).  Warpas and Jamal Qamoum evidently came to know each other through

Defendant Summer Qamoum.  When asked at deposition about the nature of her relationship with Warpas, Summer Qamoum testified only that they were "friends and colleagues" and that the they lived together in 2019.  Dkt. 24-6 at 12–13 (Qamoum Dep. at 22:9–23:6).  At the hearing, however, Qamoum's father explained that Qamoum and Warpas "are a couple" and that they are the parents of his "grandchild."  Dkt. 34 at 21 (Jamal Qamoum).  They both now live in Arkansas.[1]  *Id.* at 43.  Although Jamal Qamoum and Warpas jointly decided to create Medical Mile, Jamal Qamoum testified that he is the sole owner and investor in the company.  Dkt. 34 at 7–8 (Jamal Qamoum).  To date, he has invested approximately $65,000 in the business.  *Id.* Jamal Qamoum further testified that he did not ask Warpas if he had any agreements with M3 that would interfere with working for Medical Mile, and he attests that he was unaware that any such agreements existed.  *Id.* at 26.

On August 23, 2019, one day after Jamal Qamoum registered Medical Mile, Summer Qamoum provided two-weeks' notice to M3.  Dkt. 24-2 at 27 (Lamitina Decl. Ex. 3).  A couple of anomalies marked her departure.  For one thing, the move evidently came as a surprise to her employer.  M3's Director of Qualitative Research attested that she was "blindsided" by the news and attempted, without success, to persuade Qamoum to stay.  *Id.* at 26–27 (Lamitina Decl. Ex. 3).  For another, a forensic analysis of Qamoum's computer use showed that her activities in the final days of her employment differed dramatically from her typical activities, in ways she has been unable to explain with any clarity.  On August 28 and 29, 2019, Qamoum, still an employee at M3, repeatedly accessed pages that allowed her to view lists of M3's clients and panelists, pages that she did not frequently visit in her day-to-day work.  Dkt. 24-4 at 11–12, 20, 23

---

[1]  The complaint and the answer aver that Warpas and Qamoum reside in Texas.  Dkt. 1 at 2 (Compl. ¶¶ 3–4); Dkt. 11 at 1 (Ans. ¶¶ 3–4).  At the evidentiary hearing, however, Warpas testified that they recently moved to Arkansas.  Dkt. 34 at 43 (Warpas).

(Phillips Dep. 76:18–77:9, 108:2–14, 132:3–20).  Typically, Qamoum accessed the "reports by

target" section of the site, which allows users to search projects by type, less than five times per

month.  *See* Dkt. 24-5 at 40.  By contrast, Qamoum accessed this part of the site 86 times in

August 2019, with 47 of those times occurring on August 28 and 29.  *Id.*  During those two days,

Qamoum also repeatedly accessed the site's "survey audience" pages and repeatedly changed the

display from the default setting instead to display the maximum number of survey entries, either

800 or 6,000 depending on the number of records available.  Dkt. 24-4 at 21–23 (Phillips Dep.

129:2–132:20).  According to Neil Phillips, M3's Chief Technology Officer, Dkt. 24-5 at 2

(Phillips Decl. ¶ 1), who ran the computer analysis of Qamoum's activity, it would be possible to

cut and paste the contents of those survey entries, Dkt. 24-4 at 23–24 (Phillips Dep. 132:21–

133:6), theoretically making possible the efficient extraction of hundreds or thousands of entries

from M3's computer network.  All in all, Phillips deemed Qamoum's activity "just odd," *id.* at

12 (Phillips Dep. 77:1–3), and opined that the data suggested that Qamoum had been "searching

for a specific [set of contacts and] displaying them in a way that [would] allow [her] to extract

them," *id.* at 25 (Phillips Dep. 135:10–12).  The increased activity during August 28 and 29 is all

the more unusual in light of the fact that Qamoum asked to take August 28 off because she was

not feeling well.  Dkt. 24-2 at 25–26 (Lamitina Decl. Ex. 3).  When questioned at her deposition

about her activity during these two days, Qamoum said she did not remember the increased

activity or the reasons for it, because it "was a long time ago."  Dkt. 24-6 at 20 (Qamoum Dep.

66:22); *see also id.* at 21–28 (Qamoum Dep. 67:1–75:17).  Later, at the evidentiary hearing,

Qamoum suggested that she "was probably looking for something" as part of "wrapping up at

M3."  Dkt. 34 at 67 (Summer Qamoum).

3.    *Operation of Medical Mile*

On September 3, 2019, Qamoum left M3.  Dkt. 1 at 9 (Compl. ¶ 51); Dkt. 11 at 5 (Ans.

¶ 51).  She then joined Warpas working for Medical Mile, as a "research partner," Dkt. 24-6 at

6–8 (Qamoum Dep. 12:12–15:9), although no one working for the company "has a specific

title," *id.* at 7 (Qamoum Dep. 13:14–15).  Other members of the Qamoum family also work for

Medical Mile.  Although these individuals' duties are only loosely defined, Dkt. 34 at 10–11

(Jamal Qamoum), they are as follows: Asim (Summer Qamoum's brother) "helps with finances,"

*id.* at 10; Dkt. 24-6 at 10 (Qamoum Dep. 17:6–10); Oseas (Summer Qamoum's brother-in-law)

helps with "payments and correspondence," Dkt. 34 at 10 (Jamal Qamoum); Dkt. 24-6 at 10

(Qamoum Dep. 17:11–13); and Sejah (Summer Qamoum's sister) "set[s] up payments for clients

and for the company," Dkt. 34 at 10 (Jamal Qamoum); Dkt. 24-6 at 10 (Qamoum Dep. 17:20–

22).  To date, Asim Qamoum has received roughly $60,000 or $65,000 from Jamal Qamoum for

his work in Medical Mile, and Sejah Qamoum has received $5,000.  Dkt. 34 at 11–12 (Jamal

Qamoum).  The record does not reflect how much, if anything, Oseas Qamoum has received for

his work.

Warpas and Summer Qamoum play crucial roles at Medical Mile.  Of those working at

Medical Mile, they are the only ones with any healthcare market research experience.  Dkt. 22 at

4.  Although Jamal Qamoum testified that he anticipates hiring additional staff in the future, Dkt.

34 at 20 (Jamal Qamoum), for now, Warpas and Summer Qamoum manage operations and sales

for the company, *id.* at 10–11, and Medical Mile's sole computer server is located at their home

in Arkansas, Dkt. 22 at 3; Dkt. 22-1 at 2–5, 11 (Qamoum Dep. 12:1–15:6, 40:10–21).  Their

compensation arrangement also differs from others working with the company.  Based on "a

verbal agreement" with Jamal Qamoum, once the company starts to turn a profit, Warpas and

Summer Qamoum will each receive five percent of the profits that each generates for the

company, Dkt. 34 at 19–21 (Jamal Qamoum), and that percentage will increase as the company

grows, *id.* at 34.  But neither Warpas nor Summer Qamoum has received compensation yet for

their work for Medical Mile because, according to Jamal Qamoum, the company is not yet

generating a large enough profit.  *Id.* at 12.  In 2019, total revenue was approximately $41,000,

*id.* at 24, but the company sustained a net loss of roughly $46,000, *id.* at 12.  In 2020, revenue

was almost $500,000, *id.* at 24–25, and the company turned a profit of approximately $50,000,

*id.* at 12–13.  Warpas and Summer Qamoum each work only about 20 hours per week for

Medical Mile, *id.* at 24, and they are otherwise living off savings, *id.* at 37.

In May 2020, M3 became aware that Qamoum and Warpas were emailing M3's clients to

solicit business on behalf of Medical Mile when a "top client[]" of M3 complained about

receiving an email from Summer Qamoum titled "Reconnecting (Healthcare Research)."  Dkt.

24-1 at 15 (internal quotation marks omitted).  In this email, Summer Qamoum explained that

she was "reaching out [to the recipients,] as [their] paths may have crossed at M3, and [she was]

hoping to reconnect" because she had "recently helped co-launch a healthcare panel."  *Id.*

(internal quotation marks omitted).  The client wrote to M3:

> Here's another one I've never had an exchange with that just blasted to about a
> dozen people here.  I get that M3 can't keep employees from leaving or going to
> work for competition, but if this person was able to walk with your contact
> database, someone may want to do some competitive intelligence to make sure
> they didn't also walk with your panel.

*Id.*; Dkt. 24-6 at 48 (Ex. E).  The email received by the M3 client was not unique.  Summer

Qamoum used a template, which she created "alongside [Warpas] and [with] some input from"

her father, Dkt. 24-6 at 47 (Qamoum Dep. 122:11–13), to send at least seventy-four email

solicitations on behalf of Medical Mile in March, April, and May 2020 to clients of M3 and

possibly others.  Dkt. 24-1 at 13.  A typical email, which Qamoum sent as a "Research Partner"
of Medical Mile, read as follows:

> Not sure if you remember working with me during my days at M3.  I am finally
> on my feet at my new company and wanted to reach out to you with hopes that
> we could work together again.  [Smile Face Emoji] . . .  If you are free anytime
> next week or the week after, I would love to jump on the phone and re-
> connect. . . .  I look forward to hearing back from you soon!

*Id.* at 14; Dkt. 24-6 at 49–56 (Ex. E).  Similarly, Warpas sent at least 118 emails as a "Research

Partner" of Medical Mile to M3 clients between April and May 2020.  Dkt. 24-1 at 22; Dkt. 27-1

(Ex. B); 27-2 (Ex. C).  His emails were similar to Qamoum's and in some cases contained

phrases such as "I recently came across your name and recognized it from my days at M3," Dkt.

27-1 at 12 (Ex. B); "[It's] been some time since we collaborated while I was at M3,"  *id.* at 82

(Ex. B); and "I recognized your name from my 7[-]year tenure at M3," *see, e.g.*, *id.* at 101 (Ex.

B).  On at least two occasions, Warpas wrote: "Hoping to re-connect as I recall some of your

frustration with M3 Global Research (specifically pricing, timing and feasibility), and thought I

may offer a better alternative" to working with Medical Mile Research."  Dkt. 26-2 at 2–3 (Ex.

B).

    Since beginning operations, Medical Mile has served eighteen clients, eight of which

remain active clients of the firm.  Dkt. 31 at 4 (sealed).  Warpas and Summer Qamoum both

worked with several of these clients during their time at M3.  Warpas received commissions in

2018 or 2019 for work at M3 connected to two of Medical Mile's active clients and four of its

inactive clients.  *Id.* at 6 (sealed).  Qamoun, for her part, worked for one of Medical Mile's

current clients while still at M3, and worked with an additional three of Medical Mile's inactive

clients while at M3.  *Id.*  Another Medical Mile client was an M3 client while Warpas and

Qamoun worked at M3, although there is no evidence that either personally worked with that company while at M3.  *Id.*

M3 also alleges that Warpas and Qamoum have solicited M3 panel members on behalf of Medical Mile.  Dkt. 1 at 10 (Compl. ¶ 63).  To date, however, M3 has not produced evidence clearly demonstrating that Warpas or Qamoum knowingly contacted any M3 panelists, as opposed to clients, since leaving the company.  (It is possible that some of the emails sent by Warpas and Qamoum and submitted by M3 as evidence were sent to M3 panelists, but M3 has failed to identify which, if any, of Warpas's and Qamoum's emails fall into this category.)

**B.      Procedural Background**

M3 brought this action against Warpas, Summer Qamoum, and Medical Mile on October 9, 2020.  Dkt. 1.  The complaint alleges that "Warpas breached, is breaching, and is threatening to continue to breach" the non-compete covenant "of the PIIA by co-founding Medical Mile and being employed by an entity that provides the same or similar services to M3 clients . . . within the restricted time period and within the restricted territory . . . of the PIIA.  *Id.* at 11–12 (Compl. ¶¶ 66–74).  The complaint further alleges that Qamoum "breached, is breaching, and [is] threatening to continue to breach" the non-compete, confidentiality, and non-solicitation covenants of the PIIA by "co-founding Medical Mile and being employed by an entity that provides the same or similar services to M3 clients . . . within the restricted time period and within the restricted territory;" by "directly soliciting M3's current clients and panel members;" and by "misappropriating and misusing M3's confidential proprietary, and trade secret information;" both before and after leaving M3.  *Id.* at 12–13 (Compl. ¶¶ 77–86).  And the complaint also alleges that Qamoum breached her fiduciary duty of loyalty to M3 by "misusing her access to the Market Research system to misappropriate M3's confidential proprietary

13

information and trade secrets with the intention to use them to compete against M3 without its authorization or consent." *Id.* at 14 (Compl. ¶¶ 87-91). The complaint then asserts a series of claims jointly against Qamoum and Medical Mile, including claims for unjust enrichment, *id.* at 14–15 (Compl. ¶¶ 92–96); misappropriation of confidential information, *id.* at 15–16 (Compl. ¶¶ 97–103); violation of the Defend Trade Secrets Act of 2016, *id.* at 16–17 (Compl. ¶¶ 104–13); and violation of the District of Columbia Uniform Trade Secrets Act, *id.* at 17–18 (Compl. ¶¶ 114–23).

Defendants Warpas and Qamoum answered the complaint on November 20, 2020. Dkt. 11. That same day, Medical Mile moved to dismiss the claims against it for lack of personal jurisdiction, arguing that it lacks sufficient contacts with the District of Columbia to sustain personal jurisdiction and that it is not bound by the consents to personal jurisdiction in the District of Columbia contained in the PIIAs that Warpas and Qamoum executed when they were hired by M3. Dkt. 10. Three days later, M3 moved for expedited limited discovery to "determine the extent of [Warpas and Qamoum's] ongoing activities in violation of their PIIAs and their possession and misuse of M3's confidential and trade secret information" to support an anticipated motion for a preliminary injunction. Dkt. 13 at 2. M3 also opposed Medical Mile's motion to dismiss and sought "leave to conduct limited jurisdictional discovery to determine (1) [Medical Mile's] actual contacts with the forum and (2) [Medical Mile's] corporate ownership and corporate structure, including Qamoum and Warpas'[s] relationship with" Medical Mile. Dkt. 15 at 2. Warpas and Qamoum opposed M3's motion for expedited discovery, Dkt. 14, but sought, in the alternative, to conduct their own discovery "to resist whatever motions [M3 might] file," *id.* at 12.

On December 18, 2020, the Court granted limited, expedited discovery relating to the

Court's jurisdiction over Medical Mile and the need, if any, for preliminary injunctive relief.

Minute Entry (Dec. 18, 2020).  The Court also entered a stipulated protective order, permitting

the parties to safeguard their sensitive business information.  Dkt. 20.  Approximately three

weeks after the parties completed this limited discovery, M3 filed a supplemental memorandum

in opposition to Medical Mile's motion to dismiss, Dkt. 22, and a few days later, Medical Mile

filed a surreply in support of its motion to dismiss, Dkt. 23.  Then, on March 9, 2021, M3 moved

for a preliminary injunction against Warpas and Qamoum, Dkt. 24, seeking to bar them from

further violating the confidentiality, non-solicitation, and non-compete covenants in their PIIAs.

Dkt. 24-8 at 2 (Proposed Order).  On March 22, Warpas and Qamoum filed their opposition, Dkt.

25, and on March 31, Plaintiff replied, Dkt. 26.  On April 29, 2021, the Court held an evidentiary

hearing, at which Jamal Qamoum, Warpas, and Summer Qamoum testified under oath.  Minute

Entry (Apr. 29, 2021).  At the conclusion of the hearing, the Court ordered Medical Mile to share

with M3 its client list and ordered M3 to share with Medical Mile a list of any overlapping

clients.  *Id.*  On May 7, 2021, M3 filed a supplemental memorandum in support of its

preliminary injunction, Dkt. 30, and sealed exhibits identifying which Medical Mile clients were

M3 clients during the time of Warpas's and Qamoum's tenure and whether Warpas or Qamoum

worked with any of those overlapping clients while at M3.  Dkt. 31.  Medical Mile, Warpas, and

Qamoum, in turn, filed a joint supplemental memorandum supporting Medical Mile's motion to

dismiss and opposing the preliminary injunction.  Dkt. 32.  Both pending motions are now ripe

for decision.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) allows a defendant to move to dismiss for lack of personal jurisdiction.  In resisting such a motion, the plaintiff bears the burden of "establishing a factual basis for the exercise of personal jurisdiction" over the moving defendant.  *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  To do so, the plaintiff must "make a *prima facie* showing of the pertinent jurisdictional facts," *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988), meaning that the plaintiff must "allege specific acts connecting [the] defendant with the forum," *Clay*, 907 F. Supp. 2d at 87 (alteration in original).  "Mere conclusions or 'bare allegation[s]'" of jurisdiction are insufficient.  *Fawzi v. Al Jazeera Media Network*, 273 F. Supp. 3d 182, 186 (D.D.C. 2017) (alteration in original) (citation omitted).  Although "[a] court may dismiss the complaint if it fails facially to plead facts sufficient to establish that the Court has jurisdiction, . . . 'where necessary, the court may [also] consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'"  *Achagzai v. Broad. Bd. of Governors*, 170 F.Supp.3d 164, 173 (D.D.C 2016) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).  To the extent a factual dispute exists, "[a] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery."  *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996).

To prevail on a motion for a preliminary injunction, the moving party must show (1) "'that [it] is likely to succeed on the merits,'" (2) "'that [it] is likely to suffer irreparable harm in the absence of preliminary relief,'" (3) "'that the balance of equities tips in [its] favor,'" and (4) "'that an injunction is in the public interest.'"  *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  For many years, the D.C.

16

Circuit evaluated these factors on a "sliding scale."  *See, e.g.*, *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360–61 (D.C. Cir. 1999).  It has read the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. at 20–24, however, "at least to suggest if not to hold" that plaintiffs face "a more demanding burden" under which "a likelihood of success is an independent, freestanding requirement for a preliminary injunction," *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (internal quotation marks omitted). This issue remains the subject of some uncertainty in this circuit.  *See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("[T]his court has not yet decided whether *Winter v. Natural Resources Defense Council* . . . is properly read to suggest a sliding scale approach to weighing the four factors be abandoned." (internal quotation marks omitted)); *Am. Meat Inst. v. USDA*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc) ("This circuit has repeatedly declined to take sides in a circuit split on the question of whether likelihood of success on the merits is a freestanding threshold requirement to issuance of a preliminary injunction.").  But, notwithstanding this uncertainty, it is clear that the plaintiff's likelihood of success on the merits is a "key issue [and] often the dispositive one" at the preliminary injunction stage, *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011), and that, even if the sliding-scale approach survived *Winter*, "a plaintiff with a weak showing on the" likelihood-of-success factor "would have to show that all three of the other factors so much favor the [movant] that [it] need only have raised a serious legal question on the merits."  *Am. Meat Inst.*, 746 F.3d at 1074 (internal quotation marks omitted).

"A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits, . . . but if there are genuine issues of material fact

raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required."
*Cobell*, 391 F.3d at 261.  An evidentiary hearing, in particular, is required "when a court must
make credibility determinations to resolve key factual disputes in favor of the moving party,"
and "it is an abuse of discretion for the court to settle the question on the basis of documents
alone, without an evidentiary hearing."  *Id.*

## III.  ANALYSIS

The Court will first consider Medical Mile's motion to dismiss and will then turn to M3's
motion for a preliminary injunction.

### A.      Medical Mile's Motion to Dismiss

In most cases, "a court must engage in a two-part inquiry" to determine whether it has
"personal jurisdiction over a non-resident."  *GTE New Media Servs. Inc. v. BellSouth Corp*., 199
F.3d 1343, 1347 (D.C. Cir. 2000).  The "court must first examine whether jurisdiction is
applicable under the state's long-arm statute and [must] then determine whether a finding of
jurisdiction satisfies the constitutional requirements of due process."  *Id.*  But because personal
jurisdiction is subject to waiver, that inquiry is unnecessary in cases in which the defendant has
consented to personal jurisdiction by entering into a forum-selection clause, thereby bestowing
jurisdiction through contract principles rather than through minimum contacts.  *Sabre Int'l § v.
Torres Advanced Enter. Sols., LLC*, 60 F. Supp. 3d 21, 32 (D.D.C. 2014); *see also Holland Am.
Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 458 (9th Cir. 2007).  "[S]uch clauses are prima
facie valid and should be enforced unless enforcement is shown by the resisting party to be
unreasonable under the circumstances."  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10
(1972) (internal quotation marks omitted); *see also Atl. Marine Const. Co. v. U.S. Dist. Ct. for
W. D. Tex.*, 571 U.S. 49, 64 (2013) (holding that forum-selection clauses should be "given

controlling weight in all but the most exceptional cases." (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)); *Marra v. Papandreou*, 216 F.3d 1119, 1124 (D.C. Cir. 2000).  Here, all agree that Warpas and Qamoum entered into binding forum-selection clauses in their respective PIIAs.  In those clauses, they "expressly consent[ed] to the personal jurisdiction of the . . . federal courts for the District of Columbia in any lawsuit arising from or related to" the PIIAs.  Dkt. 13-2 at 6 (Warpas PIIA); Dkt. 13-3 at 7 (Qamoum PIIA).  That consent is dispositive with respect to the Court's personal jurisdiction over the two individual defendants in this action.

The same reasoning, however, does not so neatly extend to Medical Mile, which is not a signatory to the PIIAs.  For present purposes, M3 does not argue that Medical Mile is subject to personal jurisdiction in this forum under the D.C. long-arm statute.  Rather, it is subject to this Court's jurisdiction, if at all, based on Warpas's and Qamoum's PIIAs for one of three reasons: (1) because Warpas and Qamoum are Medical Mile's agents, Dkt. 22 at 4–5; (2) because Medical Mile is an alter-ego of Warpas and Qamoum, *id.*; or (3) because Medical Mile is "so closely related to the PIIA[s]" that it was "entirely foreseeable, fair, and reasonable that [Medical Mile] would be [haled] into Court in Washington, D.C. based on the forum-selection clause in the [Warpas and Qamoum] PIIAs," *id.* at 6–7.  As explained below, the Court is unpersuaded as to each of these theories.

### 1. *Agent-Principal Theory*

The first of M3's theories can be quickly dispatched.  Even if Warpas and Qamoum are *now* agents of Medical Mile, Medical Mile was not created until years after Warpas and Qamoum executed their respective PIIAs, and thus they could not possibly have acted as Medical Mile's agents when they signed those agreements.  Unsurprisingly, the Restatement

(Third) of Agency recognizes that an agent cannot bind a principle to a contract where the principal lacks "the capacity to incur at least voidable contractual duties," and "such capacity requires existence."  Restatement (Third) of Agency § 6.04 cmt. b (Am. L. Inst. 2006). Moreover, although a principal may adopt an agreement made before it existed, doing so "requires assent or affirmance on the part of the ratifier," *id.* § 4.04 cmt. c, and, here, M3 offers no evidence that Medical Mile ever agreed to be bound by the PIIAs.  To the contrary, Jamal Qamoum testified under oath that he was unaware of the agreements at the time that he formed Medical Mile, Dkt. 34 at 26 (Jamal Qamoum).

M3's agent-principal theory is, accordingly, unavailing.

2.      *Alter Ego Theory*

M3's second theory—that Medical Mile is merely the "alter ego" of Warpas and Summer Qamoum—fares no better.  It is blackletter law that a corporation is generally "regarded as an entity separate and distinct from its shareholders, . . . and this rule applies to" limited liability companies, like Medical Mile.  *Ruffin v. New Destination, LLC*, 773 F. Supp. 2d 34, 40 (D.D.C. 2011) (citations and quotation marks omitted); *see also Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C. Cir. 1982) (describing this principle as applying not only to shareholders, but also to "other controlling individuals").  To be sure, courts may, on rare occasion, "ignore the existence of the corporate form" and treat the individual and the organization as one and the same. *Founding Church of Scientology of Wash., D.C., Inc. v. Webster*, 802 F.2d 1448, 1452 (D.C. Cir. 1986) (citing *Quinn v. Butz*, 510 F.2d 743, 758 (D.C. Cir. 1975)).  According to M3, the Court should do so here because Medical Mile is little more than a sham, set up to evade Warpas's and Summer Qamoum's obligations under the PIIAs.  Dkt. 22 at 5–6. The Court is, once again, unpersuaded.

20

M3 fails to address what law governs whether the Court should pierce Medical Mile's status as a separate legal entity and, instead, treat the company as the alter ego for Warpas and Summer Qamoum. The question of choice of law is not an easy one. M3 asserts claims against Medical Mile under both federal law (under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.*) and under D.C. statute (under the D.C. Uniform Trade Secrets Act, D.C. Code § 36-401), as well as the common law (under theories of unjust enrichment and misappropriation). Dkt. 1 at 14–18 (Compl. ¶¶ 92–123). Further complicating matters, M3 asserts federal question jurisdiction, supplemental jurisdiction, and diversity jurisdiction. *Id.* at 2 (Compl. ¶¶ 6–9). The Court must, therefore, first consider whether federal or state law applies. "Where a veil-piercing case is brought under a federal statute, '[t]here is significant disagreement . . . over whether . . . courts should borrow state law, or instead apply a federal common law of veil piercing.'" *TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc*., 808 F. Supp. 2d 60, 64 (D.D.C. 2011) (quoting *United States v. Bestfoods*, 524 U.S. 51, 63 n.9 (1998)). "Diversity cases 'involv[ing] situations in which [a] federal interest [is] implicated by the decision whether to pierce the corporate veil' present the same obstacle." *Id.* (alterations in original) (alterations in original) (quoting *U.S. ex rel. Small Bus. Admin. v. Pena*, 731 F.2d 8, 12 (D.C. Cir. 1984)). And, if state law controls, the Court must determine whether D.C. or Michigan state law applies, as Medical Mile is a Michigan-registered LLC. That inquiry relies on D.C. choice of law rules, which require the Court to determine whether D.C. or Michigan state "'policies would be most advanced by having its law applied to the facts of the case under review.'" *Id.* (quoting *Hartley v. Dombrowski*, 744 F. Supp. 2d 328, 336 (D.D.C. 2010)).

Fortunately, the Court need not wade too deeply into this morass (without the assistance of the parties) because federal, D.C., and Michigan law do not differ in material respects. To

start, "the difference between federal alter ego law and D.C. alter ego law is immaterial."

*McWilliams Ballard, Inc. v. Broadway Mgmt. Co., Inc.*, 636 F. Supp. 2d 1, 7–8 (D.D.C. 2009).

Under federal common law, the relevant inquiry "proceeds in two steps: '(1) is there such unity

of interest and ownership that the separate personalities of the corporation and the individual no

longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable

result follow?'" *U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60

(D.D.C. 2007) (quoting *Labadie*, 672 F.2d at 96 (D.C.Cir.1982)). "Relevant to the first question

is the issue of the degree to which formalities have been followed to maintain a separate

corporate identity. The second question looks to the basic issue of fairness under the facts."

*Labadie*, 672 F.2d at 97. This test parallels D.C. law, which will "pierce the corporate veil upon

proof, 'that there is (1) unity of ownership and interest, and (2) use of the corporate form to

perpetrate fraud or wrong, or other considerations of justice and equity' justify it." *Estate of

Raleigh v. Mitchell*, 947 A.2d 464, 470 (D.C. 2008) (citation and quotation marks omitted). Like

the federal standard, the D.C. test requires an evaluation of "(1) whether corporate formalities

have been disregarded, (2) whether corporate funds and assets have been extensively

intermingled with personal assets, (3) inadequate initial capitalization, and (4) fraudulent use of

the corporation to protect personal business from the claims of creditors." *Id.* at 470–71.

Similarly, under Michigan law, no bright-line rule "delineat[es] when the corporate entity

may be disregarded." *Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. App. 1996)

(citation omitted). "To overcome the presumption" of distinct corporate status under Michigan

law, "three things must happen." *Helena Agri-Enters., LLC v. Great Lakes, LLC*, 988 F.3d 260,

271 (6th Cir. 2021). "The target corporate entity must be a 'mere instrumentality' of another

entity.  The target entity must have been used to commit a wrong.  And that wrong must have resulted in loss to the plaintiff."  *Id.* (quoting *Foodland Distribs.*, 559 N.W.2d at 381).

Here, the Court need not go beyond the first step in each of these inquires, because M3 has offered no evidence that would permit the Court to find that Medical Mile is a mere instrumentality of Warpas and/or Summer Qamoum or that Warpas and/or Summer Qamoum own or fully control Medical Mile.  To the contrary, the undisputed evidence shows that Jamal Qamoum formed the company; provided all of the capital used to fund the company; and is the sole owner of Medical Mile. Dkt. 34 at 7–8 (Jamal Qamoum).  There is no evidence, moreover, that he has failed to "respect[] corporate formalities," *Helena Agri-Enters., LLC*, 988 F.3d at 271, or that Warpas or Summer Qamoum have intermingled their funds with Medical Mile's funds. The facts that Jamal Qamoum is Summer Qamoum's father; that Warpas and Summer Qamoum are the only employees of Medical Mile with experience in market research recruitment in the healthcare space; and that the company's computer server is located at their home provide some support for M3's initial suspicions. Dkt. 22 at 3; Dkt. 22-1 at 2–5, 11 (Qamoum Dep. 12:1–15:6, 40:10–21).  But those facts alone do not, by any measure, support a conclusion that Medical Mile lacks a separate legal identity; that it is "a mere instrumentality," *Helena Agri-Enters., LLC*, 988 F.3d at 271, of Warpas and Summer Qamoum; or that the two individual defendants "so dominate [Medical Mile] as in reality to negate its separate personality," *Labadie*, 672 F.2d at 97 (internal quotation marks omitted).

M3's alter ego theory, accordingly, is also unavailing.

3.      *"Closely Related" Theory*

M3's final theory comes (slightly) closer to the mark, but it fails as well.  Although the D.C. Circuit has yet to confront the question, a number of decisions from this Court have held

"that non-parties and non-signatories to an agreement may be bound by that agreement's forum[-]selection clause if their conduct is 'closely related to the contractual relationship' so that [it] is 'foreseeable [that] they would be bound by such clause.'"  *Song fi, Inc. v. Google Inc.*, 72 F. Supp. 3d 53, 60 (D.D.C. 2014) (quoting *Sabre*, 60 F. Supp. at 34); *see also Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, 48–49 (D.D.C. 2005) (enforcing a forum-selection clause in a franchise agreement signed by a company founder against the company he established to develop the franchise); *Marra v. Papandreou*, 59 F. Supp. 2d 65, 77 (D.D.C. 1999) (finding that the non-signatory owner of a company was bound by a forum-selection clause signed by the consortium of which the company was a member), *aff'd*, *Marra*, 216 F.3d 1119.  This theory, known as the "closely related doctrine," also finds support in decisions from several courts of appeals outside the D.C. Circuit.  *See Carlyle Inv. Mgmt. LLC v. Moonmouth Co.*, 779 F.3d 214, 218–19 (3d Cir. 2015); *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 722–23 (2d Cir. 2013); *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 441 (7th Cir. 2012), *cert. denied*, 570 U.S. 918 (2013); *Holland Am. Line Inc.*, 485 F.3d at 456; *Marano Enters. of Kan. v. Z-Teca Rests., L.P.*, 254 F.3d 753, 757–58 (8th Cir. 2001); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998); *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209–10 (7th Cir. 1993); *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988).[2]

"[C]ourts considering [the] question of whether a non-signatory may be bound by a forum[-]selection clause take a common sense" approach based on the "totality of the

---

[2]  Courts differ in applying federal or state law to determine whether parties are subject to a forum-selection clause.  *Compare Magi XXI*, 714 F.3d at 722–23 (applying federal law) *with In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 58 (3d Cir. 2018) (applying state law). As with its inquiry in the context of piercing the corporate veil, however, the Court concludes that it need not resolve this question because Medical Mile does not satisfy any of the formulations of the closely related doctrine.

circumstances" and ask "whether, in light of those circumstances, it is fair and reasonable to bind

a non-party to the forum[-]selection clause." *Synthes, Inc. v. Emerge Med., Inc.*, 887 F. Supp. 2d

598, 607 (E.D. Pa. 2012) (quoting *Regions Bank v. Wyndham Hotel Mgmt., Inc.*, No. 09-cv-

1054, 2010 WL 908753, at *6 (M.D. Tenn. Mar. 12, 2010)).   The tests vary, at least in emphasis,

however, between circuits.   The Seventh Circuit, which has engaged in an extensive analysis of

the doctrine, focuses on two central concepts: affiliation and mutuality.   *Adams*, 702 F.3d at 439;

*see also Stifel, Nicolaus & Co., Inc. v. Lac du Flambeau Band of Lake Superior Chippewa*

*Indians*, 807 F.3d 184, 212–13 (7th Cir. 2015).[3]   As to the first concept, affiliation, the Seventh

Circuit asks whether a non-signatory is affiliated with a signatory, and, if so, applies the "closely

related" doctrine if there is reason to bind the non-signatory by the forum-selection clause.

*Adams*, 702 F.3d at 439–40.   For example, the court might apply the "closely related" doctrine to

prevent a company from evading a forum-selection clause by "shift[ing] business to which the

contract pertained to a corporate affiliate—perhaps one created for the very purpose of providing

a new home for the business—thereby nullifying the clause."   *Id.* at 441.   And, as to the second

concept, mutuality, the Seventh Circuit applies the doctrine to permit a non-party to enforce a

forum-selection clause against a party, if that party would be able to enforce the clause against

the non-party.   That can occur, for example, when party A to a contract may enforce the

agreement's forum-selection clause under agency law against a non-party "secret principal[]" of

party B to the contract.   *Id.* at 442–43.   In that situation, under the Seventh Circuit's reasoning,

---

[3]   In *Hugel v. Corporation of Lloyd's*, the Seventh Circuit stated that "[i]n order to bind a non-party to a forum-selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound."   999 F.2d at 209.   Since then, the Seventh Circuit has developed "affiliation" and "mutuality" as means of measuring relatedness, but *Hugel* suggests that the principle of foreseeability undergirds the Seventh Circuit's analysis.

the non-party principal should be allowed to enforce the clause against party A as a matter of "mutuality."

The Third Circuit takes a somewhat less reticulated position and will enforce a forum-selection clause with respect to a third party if that party is "closely related" to the contract, "such enforcement [would be] foreseeable to the non-signatory," and the dispute "fall[s] within the scope of the forum[-]selection clause." *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d at 59. "'In determining whether a non-signatory is closely related to a contract,'" courts in the Third Circuit must "'consider the non-signatory's ownership of the signatory, its involvement in the negotiations, the relationship between the two parties[,] and whether the non-signatory received a direct benefit from the agreement.'" *Id.* at 63 (quoting *Carlyle*, 779 F.3d at 219). Other circuits apply similar variations of this test. The Second and Eleventh Circuits assess the foreseeability of binding a party by a forum-selection clause. *See Magi XXI, Inc.*, 714 F3d at 723; *Lipcon*, 148 F.3d at 1299. So too in the Eighth Circuit, where district courts have interpreted circuit precedent to require foreseeability before deeming a non-party "closely related." *See, e.g.*, *Foreman Elec. Servs., Inc. v. Haliron Power, LLC*, No. 19-cv-4157, 2020 WL 5351076, at *5 (W.D. Ark. 2020) (quoting *Marano Enters.*, 254 F.3d at 757); *Medtronic, Inc. v. Ernst*, 182 F. Supp. 3d 925, 932 (D. Minn. 2016) (same); *CruiseCompete, LLC v. Smolinski & Assocs., Inc.*, 859 F. Supp. 2d 999, 1011–12 (S.D. Iowa 2012) (same). The Ninth Circuit, meanwhile, focuses on whether the alleged *conduct* of the non-signatory is closely related to the contractual relationship. *AMA Multimedia, LLC v. Sagan Ltd.*, 807 F. App'x 677, 679 (9th Cir. 2020); *Tribank Cap. Invs., Inc. v. Orient Paper, Inc.*, 523 F. App'x 484, 485–86 (9th Cir. 2013); *Manetti-Farrow*, 858 F.2d at 514 n.5; *see also Wilson v. 5 Choices, LLC*, 776 F. App'x 320, 328–29 (6th Cir. 2019) (focusing both on the relatedness of the non-signatories'

alleged conduct to the contract and on the Seventh Circuit's mutuality principle to enforce a forum-selection clause).

The conceptual foundation of the "closely related" doctrine is not entirely clear.  On the one hand, it seems safe to conclude that the doctrine is not based on minimum contacts, since it makes no use of the forum state's long-arm statute and does not examine the constitutionally required minimum contacts with the forum.  But, on the other hand, it is not clearly based on knowing and voluntary consent to personal jurisdiction by the "closely related" entity.  As such, the doctrine seems to sit in some tension with the Supreme Court's personal jurisdiction precedent.

Under Supreme Court precedent, "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."  *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); *see also Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting Fed. R. Civ. P. 4(k)(1)(A)).  State long-arm statutes and the Due Process Clause of the Fourteenth Amendment, in turn, generally limit the reach of state judicial authority to cases in which the defendant has sufficient contacts with the forum state.  *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945)).  Those statutory and constitutional limits do not apply, however, when "a litigant . . . give[s] 'express or implied consent to the personal jurisdiction of the court,'" such as by entering a "freely negotiated" forum-selection clause.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (first quoting *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982), then quoting *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).

To square the "closely related" doctrine with this controlling precedent, the Court must, accordingly, assess whether the it can reasonably attribute a third party's consent to jurisdiction

to apply to the non-signatory defendant as well.  In some cases, such attribution may be relatively straightforward, such as when the third party acts as the defendant's agent or the defendant is a successor to the defendant.  The easy cases, however, are already governed by the law of agency or corporations.  The question, then, is what the "closely related" doctrine adds to the law, and what limits existing Supreme Court precedent imposes on that addition.  In considering that question, the Court must avoid treating "consent" as nothing more than a "legal fiction[]" or engaging in "circular" reasoning that premises "consent" on the presumption that defendants know the law and then defines the law so that anyone engaging in the defined conduct is deemed to have consented to personal jurisdiction.  *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 900–01 & n.4 (2011) (Ginsburg, J., dissenting) (citing Lea Brilmayer, *Rights, Fairness, and Choice of Law*, 98 Yale L.J. 1277, 1304–06 (1989)).

For these reasons, the Court is skeptical that the "closely related" doctrine adds meaningfully to existing agency and corporate law and, at a minimum, would hesitate to apply the doctrine expansively and without briefs that address how the doctrine can be reconciled with the Supreme Court precedent discussed above.  For present purposes, however, the Court need not define the doctrine's permissible reach because M3 has failed to carry its burden under any reasonable formulation of the existing doctrine.

In almost every formulation, the doctrine requires foreseeability, either at the time the contractual forum-selection clause was executed or at the time the non-signatory became involved in the dispute.  Here, there is scant evidence to suggest that suit in the District of Columbia was foreseeable from Medical Mile's perspective.  First, there is no evidence that Jamal Qamoum in fact foresaw liability in this forum.  Jamal Qamoum testified under oath that he was unaware of the PIIAs at the time that he formed Medical Mile and commenced business,

Dkt. 34 at 26 (Jamal Qamoum), and there is no evidence to the contrary.  *Cf. Medtronic, Inc. v. Endologix, Inc*., 530 F. Supp. 2d 1054, 1056–57 (D. Minn. 2008) (holding that a non-signatory employer was bound by a forum-selection clause because, *inter alia*, that employer was aware of its employees' non-solicitation employment agreements with a former employer); *Ernst*, 182 F. Supp. 3d at 932–33 (declining to hold that an employer was bound by a forum-selection clause, notwithstanding knowledge of its employee's forum-selection agreement with a former employer, because the new employer had not voluntarily joined the contracting party in some type of litigation); *Synthes*, 887 F. Supp. 2d at 609–11 (finding that an employer was bound by a forum-selection clause because, *inter alia*, that employer knew about its employees' non-compete agreements with a former employer).  Second, M3 has not persuasively shown that this Court's jurisdiction over Medical Mile was objectively foreseeable.  Neither Jamal Qamoum nor Medical Mile has any contacts with the District of Columbia, nor have they signed contracts submitting to this district's jurisdiction.  Medical Mile's only potential contact with the District of Columbia lies in the agreements signed by two of its contractors—individuals who, as the Court has already explained, are not alter egos or agents of Medical Mile, *see infra* Part III.A.2.

Nor are any of the other factors that courts have relied upon to establish that a non-party is closely related to the dispute present here.  Jamal Qamoum testified, for example, that he is the sole owner of Medical Mile, Dkt. 34 at 7–8 (Jamal Qamoum), and all three witnesses testified that Warpas and Summer Qamoum have no ownership interest whatsoever in Medical Mile, *id.* at 23, 34, 68.  *Cf. Hugel*, 999 F.2d at 209–10 (holding that a defendant was bound by a forum-selection clause entered into by companies of which the defendant owned the vast majority of stock); *Peterson v. Evapco, Inc.*, 188 A.3d 210, 237–38 (Md. Ct. Spec. App. 2018) (concluding that a company co-owned by the defendant and created to compete with a former employer was

closely related to the defendant and bound by the forum-selection clause).  Likewise, there is no

evidence that Medical Mile benefited from the PIIAs; to the contrary, it was not created until

after Warpas had resigned and Summer Qamoum was on the verge of quitting.  *C.f. Hugel*, 999

F.2d at 209 n.7 ("While it may be true that third-party beneficiaries of a contract would, by

definition, satisfy the 'closely related' and 'foreseeability' requirements, a third party beneficiary

status is not required.") (citation omitted).  Finally, there is no evidence that Medical Mile was

formed to allow Warpas and Qamoum to evade the non-compete agreements or forum-selection

clauses in the PIIAs.  All that the evidence shows is that Medical Mile was formed by the father

of an M3 employee who later went to work for Medical Mile.  Standing alone, that is far from

sufficient to establish that Medical Mile is bound by the PIIAs that Warpas and Summer

Qamoum signed years ago.

     The Court therefore concludes that the "closely related" doctrine does not apply on the

facts of this case.

*   *   *

     Because all three of M3's theories of personal jurisdiction over Medical Mile fail, the

Court will grant Medical Mile's motion to dismiss without prejudice.  If discovery reveals

evidence that would support this Court's personal jurisdiction over Medical Mile, M3 may seek

leave to amend its complaint to reassert its claims against Medical Mile at that time.

**B.     M3's Motion for Preliminary Injunction**

     The Court's holding that it lacks personal jurisdiction over Medical Mile has no bearing

on M3's motion for a preliminary injunction, which seeks to enjoin Warpas and Summer

Qamoum—and only Warpas and Summer Qamoum—from further violating the confidentiality,

non-solicitation, and non-compete covenants in their respective PIIAs.  Dkt. 24 at 1; Dkt. 24-8 at

30

2.  Applying the four-factor test that governs motions for preliminary injunctions, *see Winter*, 555 U.S. at 20, the Court is persuaded that M3 is likely to prevail on the merits, at least in part, but is unpersuaded that M3 has demonstrated that a preliminary injunction is needed to avert an irreparable injury to M3's business or that the balance of hardships or public interest tips in favor of granting preliminary relief.  The Court will, accordingly, deny M3's motion for a preliminary injunction as the record now stands but will permit the company to renew its motion on short notice if Warpas and/or Qamoum engage in further misconduct likely to cause irreparable harm to M3.

        1.    *Likelihood of Success on the Merits*

M3 contends that it is likely to succeed on the merits because Warpas and Qamoum "are in clear breach of their" PIIAs, "specifically[,] by joining a newly-formed competitor of M3 . . . within a year of termination of their employment with M3, in violation of" the non-compete covenant; "by directly soliciting the business of M3's customers, clients[,] and survey plan members within a year of the termination of their employment with M3, in violation of" the non-solicitation covenant; "and by misappropriating and misusing confidential and proprietary information developed [by] and belonging to M3, . . . in violation of" the confidentiality covenant.  Dkt. 24 at 1–2.

The Court pauses at the outset to consider whether the preliminary relief that M3 seeks falls within the compass of its complaint.  The answer to that question is straightforward with respect to Summer Qamoum:  M3 seeks a preliminary injunction enforcing the confidentiality (Sections 3 and 4), non-solicitation (Section 5), and non-compete (Section 7) provisions of Qamoum's PIIA, and the complaint alleges that she has violated, and is continuing to violate, each of those provisions.  Dkt. 1 at 12–14 (Compl. ¶¶ 75–86).  It is less clear, however, that the

preliminary relief that M3 seeks against Warpas falls within the scope of the complaint.  The

complaint includes only one breach of contract count against Warpas, and that count invokes

only the non-compete (Section 7) provision of Warpas's PIIA.  *Id.* at 11–12 (Compl. ¶¶ 66–74).

The only other count of the complaint directed at Warpas is count eight,[4] which seeks a

preliminary and permanent injunction against "[a]ll Defendants" and broadly alleges that

"Defendants"—without differentiation—"have engaged in breach of contract, breach of fiduciary

duty, and other wrongful and tortious acts" involving "[t]he . . . misuse of M3's confidential and

proprietary business information, unfair competition, and solicitation of M3's panel members."

*Id.* at 19 (Compl. ¶¶ 125–26).  The Court is unprepared to read this count to assert claims against

Warpas for breaching the confidentiality and non-solicitation covenants of his PIIA, however, for

two reasons.  First, count eight incorporates the preceding factual allegations of the complaint,

and, as to Warpas (as opposed to Qamoum), those factual allegations focus exclusively on the

non-compete provision of the PIIA.  Indeed, although the complaint does note that Warpas was

provided with access to confidential and proprietary information, it makes no mention of the

confidentiality or non-solicitation covenants when it comes to Warpas.  *See id.* at 4–6 (Compl.

¶¶  22–35); *see also id.* at 11–12 (Compl. ¶¶ 66–74).  That contrasts markedly with the

complaint's allegations with respect to Qamoum, which refer to her breaching all three of the

pertinent covenants.  *Id.* at 6–9 (Compl. ¶¶ 36–56); *see also id.* at 12–14 (Compl. ¶¶ 75–86).

Second, count eight does not assert a separate cause of action but, rather, merely seeks a specific

form of relief.  *Equitas Disability Advocates, LLC v. Bryant*, 134 F. Supp. 3d 209, 222

("[I]njunctive relief is a type of remedy, not a freestanding cause of action."); *see also Base One*

---

[4] Although termed "count six" in the complaint, this is the eighth count in the complaint; another, earlier count is also termed "count six."

*Techs., Inc. v. Ali*, 78 F. Supp. 3d 186, 199 (D.D.C. 2015); *Johnson v. District of Columbia*, 49 F.

Supp. 3d 115, 117 n.1 (D.D.C. 2014).  As a result, fairly construed, the complaint asserts only

one cause of action against Warpas, and that is for breaching the non-compete covenant.  To the

extent M3 has a factual and legal basis to do so, the Court will permit the company to amend its

complaint on or before June 18, 2021, to assert claims against Warpas under the confidentiality

and non-solicitation covenants.

Turning to the evidence submitted thus far, the Court has little difficulty in concluding

that both Warpas and Qamoum solicited clients with whom they became acquainted while

working at M3.  On April 24, 2020, for example, Warpas wrote to two prospective clients

"hoping to re-connect," "recall[ing] some of [the prospective clients'] frustrations with M3

Global Research (specifically pricing, timing and feasibility)," and "offer[ing] a better alternative

of working with Medical Mile Research."  Dkt. 27-1 at 2–3 (Ex. B).  He wrote to eight other

prospective clients in late May 2020 noting that it had "been some time since [they] collaborated

while [Warpas] was at M3 Global Research" and announcing that he had "recently helped launch

a new healthcare panel, offering access to extensive respondent profiling across daily functions,

management responsibilities, and treatment/working settings."  *Id.* at 82–88, 90 (Ex. B).  And he

reached out to yet other prospective clients, observing that he "recognized [the client's] name

from [his] 7[-]year tenure at M3 Global Research," *id.* at 91–101 (Ex. B).  Qamoum, for her part,

sent a barrage of similar emails to prospective clients.  In some emails, Summer introduced

herself by stating that she was "[n]ot sure if [the client] remember[ed] working with [her] during

[her] days at M3," Dkt. 27-2 at 3–10 (Ex. C); in others, she more tentatively explained that she

was "reaching out as [her and the client's] paths m[a]y have crossed during [her] time at M3"

and Qamoum was "hoping to reconnect," *id.* at 11–74 (Ex. C).  In at least one case, far less

tentatively, Qamoum reminisced about her memory of "chatting with [the M3 client] early last year over the phone about the patients and caregivers on [their joint] project showing up to the studio in Philly," *id.* at 75 (Ex. C).

Despite these emails, both Warpas and Qamoum claim that they were not drawing on their contacts from M3 but, rather, were using "a sales tactic" to garner the attention of potential clients they located using other means.  Dkt. 24-6 at 47 (Qamoum Dep. 122:3–10); Dkt. 34 at 39 (Warpas).  Warpas went a step further during his testimony before the Court, moreover, claiming that he could not recall the names of any—not one—of his M3 clients because he worked at M3 "a long time ago."  *Id.* at 52.  Neither contention is plausible.  To the extent that Warpas and Qamoum mean to say that they sent their emails without any idea whether the recipients were M3 clients, the text of several emails belies that contention.  And, beyond that, it is hard to believe that they sought to woo clients by falsely claiming to recall them from their days at M3, without any idea whether those potential clients would immediately recognize the ploy because they, in fact, had not worked with M3 in recent years.  Warpas's claim that he could not recall any of his clients from M3 is even more implausible.  He claimed, for example, not to recall his "second highest revenue client" from 2019.  *Id.* at 51.  To be sure, when pressed, Warpas conceded that, if he thought "hard, [he] could probably name some clients that ring a bell," and explained that since 2018 he had become more distant from the M3 clients in light of his senior, managerial role.  *Id.* at 53.  But reaching back, even as far as 2017, is no Herculean feat, and, more importantly, it is difficult to believe that M3's Senior Vice President for Market Research Sales held so lofty a position that he did not know the names of any of the company's clients.  That contention is all the more remarkable—and difficult to believe—given that M3 sent Warpas an email on August 19, 2019, after his termination from M3, asking for him to sign off on a final

commission report to ensure the accuracy of the report.  Dkt. 31 at 12–20 (sealed).  To sign off

on the reports, Warpas was required to approve the listed client names, revenue figures, and his

commission associated with each.  *Id.*  Among other things, that report identified the major M3

client that Warpas claimed not to recall at the evidentiary hearing.  Dkt. 30 at 2.

It is also clear that Medical Mile serves clients that Warpas and Qamoum previously

served while working at M3.  Medical Mile identified all of its eight active and ten inactive

clients in response to a Court order.  Fourteen of those clients were M3 clients during Warpas's

and Qamoum's employment with M3, and Warpas received a sales commission for his work on

six of those fourteen clients.  Dkt. 33-2 at 1 (sealed).  Qamoum, for her part, worked on matters

involving three of the clients with whom Warpas had worked, as well as a fourth client who did

not work with Warpas.  *Id.*

There is also evidence that Qamoum reviewed numerous confidential M3 files after she

decided to join Warpas and her father at Medical Mile and before she left M3.  In October 2020,

M3's Chief Technology Officer, Neil Phillips, performed a forensic analysis of Qamoum's

computer use (although not of her computer itself, which M3 could not find) and generated an

"Activity Report."  Dkt. 24-5 at 2–3 (Phillips Decl. ¶¶ 1, 6).  As Phillips later testified, to prepare

this report he "pulled records of [Qamoum's] last three years of activity by month and by day for

each section of the system [a]nd compared frequency of use of each part of the system for each

day."  Dkt. 24-4 at 9 (Phillips Dep. 74:9–12).  Phillips's analysis showed that Qamoum's use of

confidential computer systems was "unusually high" on August 28 and 29, 2019, after she gave

notice that she was resigning from M3.  *Id.* (Phillips Dep. 74:13–14); *see also id.* at 9–12, 14,

16–20 (Phillips Dep. 74:15–77:9, 89:2–4, 96:8–100:20, 108:2–15).  This activity is especially

suspicious given that Qamoum asked to take a personal day on August 28 because she was "not

feeling well."  Dkt. 24-2 at 25-26 (Lamitina Decl. Ex. 3).  Qamoum, for her part, has not offered

a convincing explanation for her increased use of these confidential systems during her final days

at M3.  When asked about this unusual activity at her deposition, Qamoum claimed not to

remember running the reports, merely observing it "was a long time ago."  Dkt. 24-6 at 20

(Qamoum Dep. 66:6–22); *see also id.* at 21–28 (Qamoum Dep. 67:2–75:21) (repeatedly claiming

not to remember running various searches).  Similarly, when testifying at the evidentiary hearing,

Qamoum stated that she could not remember running the reports but speculated that she "was

trying to hurry up and teach all of the new [staff] [her] projects."  Dkt. 34 at 67–68 (Summer

Qamoum).

       In light of this factual record, the Court has little difficulty concluding that both Warpas

and Qamoum have likely violated at least some of their contractual obligations to M3.  The

emails submitted show that Qamoum likely violated the non-solicitation agreement.  The overlap

between Medical Mile clients and clients served by Warpas and Qamoum at M3 demonstrate that

both former employees likely violated the non-compete agreement.  As to the confidentiality

agreement, on the existing record, the Court finds that the most likely explanation of Qamoum's

behavior during her final days at M3 is that she was reviewing the confidential files in

anticipation of starting work with Medical Mile.  The fact that she asked to take a personal day

on August 28; did not tell M3 the real reason she was leaving the company; the extent of her

"unusually high" use of the confidential systems, Dkt. 24-2 at 9 (Phillips Dep. 74:13–14); and

her inability to recall why she did so all support that conclusion.  The Court recognizes, however,

that the case is in its early stages, and discovery may reveal additional information that supports

or undermines M3's contention that Qamoum was accessing the information to benefit herself

and Medical Mile.  More importantly for present purposes, the Court also finds that there is no

evidence that Qamoum printed or copied any of the reports that she ran on August 28 and 29,

and there is no evidence that she physically transferred any of this information to Medical Mile.

As a result, there is nothing for the Court to order that Qamoum physically return at this time,

nor can the Court discern any *preliminary* relief that might remedy the alleged breach of

Qamoum's duties of loyalty and that enforcement of the non-solicitation and non-compete

provisions of Qamoum's PIIA would not already provide.  Indeed, regardless of whether

Qamoum identified the M3 clients whom she subsequently emailed with solicitations on August

28 and 29, or more generally through her employment at M3, that information is subject to her

contractual duty of confidentiality.

The Court, accordingly, finds that M3 is likely to prevail on its claim that Warpas has

violated his non-compete covenant and that Qamoum has violated her non-solicitation, non-

compete, and confidentiality covenants.  The bulk of this evidence, however, appears to relate to

improper solicitation and work with M3's corporate clients—that is, those clients who purchase

survey data from M3.  There is relatively little evidence, by comparison, that Warpas and

Qamoum have improperly contacted or contracted with M3 panelists—that is, those who provide

the input used to complete the surveys.  To be sure, an M3 witness testified that he received

some unspecified number of complaints from M3 panelists who heard from Medical Mile, *see*

Dkt. 24-3 at 11 (Richter Dep. 159:8–14), and it is possible that some of the emails that Warpas

and Qamoum sent out went to M3 panelists.  But M3 has the burden of proof, and it has failed to

carry its burden with respect to the panelists at this early stage of the litigation.

Beyond disputing much of this evidence, Warpas and Qamoum argue that M3 is unlikely

to prevail on the merits for three additional reasons.  They maintain that (1) the relief M3 seeks

would disrupt the status quo, contrary to the purpose of a preliminary injunction, which is "to

preserve the relative positions of the parties until a trial on the merits can be held," Dkt. 25-1 at 8

(internal quotation marks omitted); (2) the restrictive covenants are unenforceable, as they apply

to an unreasonable geographic scope, *id.* at 9–14; and (3) the client information Qamoum

allegedly misappropriated does not qualify as a "trade secret" and therefore is not entitled to

protection, *id.* at 19.  These arguments fail.

     a.  <u>Disruption of the Status Quo</u>.  A preliminary injunction is "a stopgap measure,

generally limited as to time, and intended to maintain a status quo or 'to preserve the relative

positions of the parties until a trial on the merits can be held.'"  *Sherley*, 689 F.3d at 781–82

(quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).  Here, Warpas and Qamoum

maintain that the status quo has existed for "approximately 1.5 years," during the period that they

have worked for Medical Mile, Dkt. 25-1 at 8, and, in their view, that is the "status quo" that

should be preserved during the pendency of the litigation.  In other words, according to Warpas

and Qamoum, it is M3 that seeks to alter the status quo, and M3 should not be allowed to do so

at this preliminary stage of the litigation.

     Warpas and Qamoum misunderstand what it means to maintain the status quo while a

case is pending on the merits.  As the D.C. Circuit has explained, "[t]he status quo is the last

uncontested status which preceded the pending controversy."  *Dist. 50, United Mine Workers of

Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969) (quoting

*Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958)); *see

also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo

ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last

uncontested status which preceded the pending controversy.'" (quoting *Tanner Motor Livery,

Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963));  Donald J. Aspelund & Joan E. Beckner,

*Employee Noncompetition Law* § 8:5 (2020).  Here, the last uncontested status existed prior to

the time Warpas and Qamoum solicited M3 clients while working for Medical Mile.  The relief

that M3 seeks—preventing Warpas and Qamoum from continuing to do so—would restore this

last pre-dispute status and therefore preserve the status quo.

   b.  <u>Enforceability of the Restrictive Covenants</u>.  Warpas and Qamoum next argue that the

applicable covenants are unenforceable because they are unreasonably expansive in geographic

scope.  In assessing the validity of restraints on postemployment competition, the D.C. Court of

Appeals has turned to the Restatement (Second) of Contracts: Restraint of Trade (Am. L. Inst.

1981) ("Restatement of Contracts").[5]  *See Deutsch v. Barsky*, 795 A.2d 669, 675 (D.C. 2002);

*Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 618–19 (D.C. 1989).  As explained in

Section 186 of the Restatement, "[a] promise is unenforceable on grounds of public policy if it is

unreasonably in restraint of trade.  . . . A promise is in restraint of trade if its performance would

limit competition in any business or restrict the promisor in the exercise of a gainful occupation."

Section 188 deals, in particular, with restraints on competition:

> (1) A promise to refrain from competition that imposes a restraint that is
> ancillary to an otherwise valid transaction or relationship is unreasonably in
> restraint of trade if
>
> (a) the restraint is greater than is needed to protect the promisee's legitimate
> interest, or
>
> (b) the promisee's need is outweighed by the hardship to the promisor and the
> likely injury to the public.

Restatement of Contracts § 188.  The Restatement goes on to explain, in comment g, that

---

[5]  The parties to the PIIAs agreed that "[t]he validity, construction, operation[,] and effect of" the
PIIAs would "be governed by, and construed and enforced in accordance with[,] the laws of the
District of Columbia," Dkt. 13-2 at 6 (Warpas PIIA); Dkt. 13-3 at 7 (Qamoum PIIA), and the
Court will, accordingly, apply D.C. law for purposes of M3's motion for a preliminary
injunction, which solely seeks to enforce the terms of the PIIAs.

> [t]he employer's interest in exacting from his employee a promise not to
> compete after termination of the employment is usually explained on the ground
> that the employee has acquired either confidential trade information relating to
> some process or method or the means to attract customers away from the
> employer. Whether the risk that the employee may do injury to the employer is
> sufficient to justify a promise to refrain from competition after the termination
> of the employment will depend on the facts of the particular case. Post-
> employment restraints are scrutinized with particular care because they are often
> the product of unequal bargaining power and because the employee is likely to
> give scant attention to the hardship he may later suffer through loss of livelihood.
> . . . If the employer seeks to justify the restraint on the ground of the employee's
> ability to attract customers, the nature, extent[,] and locale of the employee's
> contacts with customers are relevant. A restraint is easier to justify if it is limited
> to one field of activity among many that are available to the employee. The
> same is true if the restraint is limited to the taking of his former employer's
> customers as contrasted with competition in general.

*Id.* § 188 cmt. g.

D.C. law encompasses this balance in a two-step process. The Court must first consider
whether the restraint serves a legitimate interest of the promisee, and, then, must consider
whether the hardship to the promisor outweighs the promisee's legitimate interest. *See Deutsch*,
795 A.2d at 677, 679. In applying the second step, courts consider whether the terms of a non-
compete agreement "are reasonable in duration and geographic scope." *Robert Half Int'l Inc. v.
Billingham*, 315 F. Supp. 3d 419, 430 (D.D.C. 2018) (citation omitted); *see also Smith, Bucklin
& Assocs., Inc. v. Sonntag*, 83 F.3d 476, 480 (D.C. Cir. 1996) ("Such covenants are perfectly
legitimate under District of Columbia law so long as they are reasonably tailored.").

Warpas and Qamoum do not challenge the one-year duration of the non-solicitation and
non-compete covenants as unreasonable, nor could they, as "[c]ourts applying District of
Columbia law repeatedly have upheld restrictions that contain comparable restrictions with
respect to time." *Billingham*, 315 F. Supp. 3d at 430–31 (collecting cases that upheld non-
compete clauses lasting one to three years). Likewise, and presumably for the same reason, they
do not challenge the extension of the covered period to account for a period of violation.

Instead, Warpas and Qamoum take aim at the nationwide nature of the restraints, noting that "courts in this District [analyzing] the reasonable geographic scope of non-competes have only allowed much smaller geographic scopes to be upheld." Dkt. 25-1 at 10. M3, for its part, acknowledges that "there are no cases directly addressing District of Columbia law on the enforceability of a similar nationwide non-compete covenant." Dkt. 26 at 5.

Defendants' unreasonable-geographic-scope argument faces a substantial difficulty at the outset. Under D.C. law, "the territorial limitation requirement is generally inapposite where the preliminary injunction entered by the trial court enjoins appellant, not generally from competing in the same field as [the former employer], but merely from soliciting [the former employer's] customers." *Ellis*, 565 A.2d at 620 (citing *Hebb v. Stump, Harvey and Cook, Inc.*, 334 A.2d 563, 560–70 (Md. Ct. Spec. App. 1975)). That exception makes sense because, by limiting the non-compete to former customers, the contract achieves the tailoring required to strike the required balance between protecting the former employer's legitimate interest while, at least in most cases, not unduly restricting the former employee. Indeed, limiting a non-compete to the former employer's customers is arguably better tailored than most territorial restrictions; if a former employee, for example, served two large clients—one located in California and the other in Ohio—it would make far greater sense to restrict that employee from soliciting those two customers than restricting her from soliciting all customers in California and Ohio.

Here, the non-compete covenant contained in the Warpas and Qamoum PIIAs is limited in this fashion. It precludes the former employee from working for a competing company that provides "the same or similar services for any customer or client of [M3] for whom the [e]mployee provided any such services pursuant to" the PIIA. Dkt. 13-2 at 5 (Warpas PIIA § 7); Dkt. 13-3 at 5 (Qamoum PIIA § 7). Warpas and Qamoum, accordingly, can comply with this

41

covenant by refraining from providing services to any client for whom they provided services while employed at M3.  The non-solicitation covenant contained in Qamoum's PIIA arguably sweeps somewhat more broadly, since it applies not only to clients to whom she provided services while employed at M3, but also applies to M3 clients that she "became acquainted with or aware of" during her tenure at M3.  Dkt. 13-3 at 5 (Qamoum PIIA § 5).  But the same principle comes into play.  Neither covenant seeks to prevent competition on a wholesale basis, and both apply only to companies that were M3 clients at the time that Qamoum (or Warpas) worked for M3.  *See Ellis*, 565 A.2d at 620 (territorial limitation does not generally apply to covenants not to compete by "soliciting [the former employer's] customers").  Indeed, if anything, the covenants at issue here are narrower than those that D.C. case law has previously enforced, *see Ellis*, 565 A.2d at 620–21, because the PIIA covenants apply to only those M3 clients that Warpas and Qamoum worked with while at the company, Dkt. 13-2 at 5 (Warpas PIIA, ¶ 7); Dkt. 13-3 at 5 (Qamoum PIIA § 7), or "became acquainted with" while at M3, *id.* (Qamoum PIIA § 5).  *See Ecolab, Inc. v. K.P. Laundry Mach., Inc.*, 656 F. Supp. 894, 898–99 (S.D.N.Y. 1987) (enforcing non-compete clause that applied "only to customers serviced by the particular employee within his last twelve months at" the former employer).

Warpas and Qamoum attempt to counter this argument by arguing that M3 serves—and has served—almost every client in the field, and thus a prohibition on soliciting or working with those clients would, in effect, preclude them from working in their existing profession.  Dkt. 25-1 at 10.  That argument fails, however, for at least two reasons.  First, Warpas and Qamoum offer no evidence that M3 serves—or has served—most, much less all, clients in the field.  Second, the evidence refutes their contention.  As explained above, a comparison of the active and inactive Medical Mile clients and M3's 2019 clients shows that Medical Mile has worked with at least

four clients who were not also M3 clients.  Dkt. 33-2 at 1 (sealed).  Even more importantly, M3 acknowledges that Warpas did not work with eight of the overlapping clients while at M3, and that Qamoum worked with only four of the overlapping clients.  *Id.*  Beyond identifying one additional Medical Mile client as a "significant M3 client during [their] employment," M3 does not argue—or suggest—that Qamoum (or Warpas) became "acquainted with" any of the other, overlapping clients during her tenure at M3.  *Id.*

Warpas and Qamoum also contend that the non-compete covenant "ban[s] the [e]mployee Defendants from everything in the medical survey space from children's chewable vitamins to open heart surgery," creating a hardship for Warpas and Qamoum that outweighs any legitimate interest of M3.  Dkt. 25-1 at 13.  But, by its terms, the covenant does not do that; the covenant bars Warpas and Qamoum from working only for competitors that provide "the same or similar product or services for any customer or client" served by Warpas and Qamoum while at M3.  Dkt. 13-2 at 5 (Warpas PIIA § 7); Dkt. 13-3 at 5 (Qamoum PIIA § 7).  Moreover, even if the PIIAs limited the ability of Warpas and Qamoum to work in the healthcare "market research recruitment" fields for twelve months, neither has offered any evidence showing that they were unable to work in a similar field during that period.  *See* Restatement of Contracts § 188 illus. 9 (noting that a non-compete contract restricting a research chemist from working "in the pharmaceutical industry at any place in the country for three years after the termination of his employment" could be reasonable if the chemist "can find employment as a research chemist outside of the pharmaceutical industry"); *see also Allegis Grp., Inc. v. Jordan*, No. 12-2535, 2014 WL 2612604, at *7 (D. Md. 2014) (upholding a contract barring an employee from working as a salesman and corporate leader in staffing companies providing personnel in scientific, software, engineering, and administrative roles because the former employee could

apply his skills "in a similar or related industry").  Although the PIIA certainly precluded Warpas and Qamoum from building a competing business based on the contacts they made at M3, that restriction seems reasonable.

Although Warpas and Qamoum argue that D.C. "statutory law is trending away" from enforcing non-compete agreements, Dkt. 25-1 at 13, the Court is, once again, unconvinced.  In support of this contention, Warpas and Qamoum point to a recently passed D.C. statute that bars such contractual provisions.  *Id.* at 13, 14 n.4; D.C. Act 23-563 (Jan. 11, 2021).  But the new law has yet to take effect and, in any event, applies only to non-compete agreements formed after the law's effective date.  *See* D.C. Act 23-563 § 102(b).  The "trend" has thus arrived too late to help them in this case.

The Court, accordingly, concludes that the non-compete and non-solicitation covenants are enforceable, notwithstanding their nationwide scope.

c.  <u>Customer Lists as "Trade Secrets."</u>  Finally, Warpas and Qamoum argue that M3 "has not even established that the allegedly stolen contact information lists qualify for actual trade secret protection under [D.C.] law."  Dkt. 25 at 19.  Because "M3 acquires customer information from cold calling, internet searches, and purchasing contact lists from third party data providers who sell licenses to their databases," Warpas and Qamoum contend that "this information is easily ascertainable by the public" and therefore cannot amount to trade secrets.  *Id.*

Setting aside the merits of this argument, M3's motion for a preliminary injunction does not sound in trade secret protection but, instead, is premised on breach of contract.  Dkt. 26 at 16.  Qamoum agreed to the confidentiality covenant (as did Warpas), and that covenant included appendices clarifying that vendor and customer lists constitute confidential information for purposes of the PIIA.  Dkt. 13-2 at 8 (Warpas PIIA Appendix); Dkt. 13-3 at 8 (Qamoum PIIA

Appendix).  Accordingly, regardless of whether the information at issue meets the common law or statutory definition of "trade secrets," Qamoum (and Warpas) agreed to treat the information as confidential.  For the reasons discussed above, it is unclear whether Qamoum's agreement to treat vendor and customer lists as confidential adds anything, at least in the context of the pending motion for a preliminary injunction, to her (and Warpas's) separate covenants not to compete and not to solicit M3 customers or clients.  But that factual question has no bearing on Qamoum and Warpas's legal argument regarding the reach of the confidentiality covenant.

*   *   *

For the foregoing reasons, the Court concludes that M3 has demonstrated a likelihood of success on the merits with respect to its efforts to enforce the PIIAs' non-compete covenant against Warpas and Qamoum and the PIIAs' non-solicitation covenant against Qamoum. Although M3 also has enforceable rights against Qamoum under her PIIA's confidentiality provision, those rights appear to overlap with the rights created by the non-compete and non-solicitation covenants in material respects.  The Court is unpersuaded, however, that M3 has shown that Warpas and Qamoum have violated (or are likely to violate) their respective PIIAs by soliciting M3 panel members.

2.  *Irreparable Injury*

In order to obtain a preliminary injunction, however, M3 must show more than that it is likely to succeed on the merits with respect to at least some of its claims.  It must also demonstrate that it is likely to suffer an irreparable injury if denied preliminary relief, and M3's motion falters at this step in the inquiry.

As this Court has previously observed, a showing that the movant will likely suffer an irreparable injury "is the *sine qua non* for obtaining a preliminary injunction—it is what justifies

45

the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Calif. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (quoting *Achagzai v. Broad. Bd. of Governors*, No. 14-cv-768, 2016 WL 471274, at *3–4 (D.D.C. Feb. 8, 2016)). "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is 'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'" *Hi–Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (quoting *Gulf Oil Corp. v. Dept. of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)). As framed in an oft-quoted passage from the D.C. Circuit, "the injury must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Moreover, an injury that is both likely and substantial is not enough, if that injury can be remedied through "compensatory or other corrective relief . . . available at a later date." *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958). Thus, "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wisc. Gas Co*., 758 F.2d at 674. Finally, "conclusory assertions of potential loss" will not suffice; rather, the movant "bears the burden of presenting 'specific details regarding the extent to which [its] business will suffer,'" *Calif. Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 171 (quoting *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Res. Syst*., 773 F. Supp. 2d 151, 181 (D.D.C. 2011)), and of linking that injury to the specific legal claim upon which the movant is likely to prevail.

Because "[i]njury to . . . goodwill is not easily measurable in monetary terms," courts will often find that the breach of a covenant not to compete by a former employee who contacts the employer's customers "supports a finding of irreparable injury." 11A C. Wright & A. Miller,

Federal Practice and Procedure § 2948.1 (3d ed. Apr. 2021 update).  But that conclusion is far

from inevitable because "[t]he loss of business opportunities, market share, and customer

goodwill are typically considered to be economic harms," and "[i]t is well settled in this [c]ircuit

that 'economic loss does not, in and of itself, constitute irreparable harm.'"  *Air Transp. Ass'n of*

*Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012) (quoting

*Wisconsin Gas*, 758 F.2d at 674).  Thus, to show that loss of goodwill or loss of customers

constitutes an irreparable injury, the movant must show that its ongoing injury is grave—if not

existential—or that the loss is "incalculable."  *See Hosp. Staffing Sols., LLC v. Reyes*, 736 F.

Supp. 2d 192, 199 (D.D.C. 2010) ("A number of [decisions] in this Circuit have declined to issue

preliminary injunctions to enforce restrictive covenants against former employees where the

employer failed to show that the economic losses from the breach are either incalculable or so

substantial as to threaten the employer's ability to stay in business."); *see also Smith, Bucklin*, 83

F.3d at 481; *Ajilon Prof'l Staffing, PLC v. Kubicki*, 503 F. Supp. 2d 358, 362 (D.D.C. 2007).  *But*

*see Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34 (D.D.C. 2002)

(noting that it is, at times, "impossible to calculate the investments that would have flowed from

[those] customers' accounts").

  Although the PIIAs stipulate that a breach of any of the relevant covenants would

constitute "irreparable harm," Dkt. 13-2 at 4–5 (Warpas PIIA § 4–5, 7); Dkt. 13-3 at 4–5

(Qamoum PIIA § 4–5, 7), these provisions do not resolve the matter.  In this circuit, "a

contractual provision that states that the company has suffered irreparable harm if the employee

breaches the covenant and that the employee agrees to be preliminarily enjoined . . . is an

insufficient prop" to support an injunction.  *Smith, Bucklin*, 83 F.3d at 481 (citing *Ellis*, 565 A.2d

at 619 n.14).  Thus, the Court cannot rely on a contractual diagnosis of irreparable harm, but must instead assess the risk of such injury based on the facts of the case.

Although the Court permitted M3 to take limited discovery regarding its asserted, irreparable injury, M3 has failed to make the required evidentiary showing.  To start, M3 does not argue—nor could it argue—that Warpas and Qamoum have engaged in any conduct that poses a fundamental threat to M3's business.  After over 18 months of operation, Medical Mile has eight active clients, Dkt. 33-1 at 1 (sealed), as compared to M3, which is "probably" the largest "company in [the same] space" and which has "thousands of clients" and "millions" of panelists, Dkt. 34 at 62–63 (Warpas).[6]  Moreover, although M3 maintains that Warpas and Qamoum's solicitation of M3 clients poses "an immediate, unquantifiable future threat to [M3's] business," Dkt. 24-1 at 27, that conclusory assertion is unsupported by any evidence or explanation.  If Warpas and Qamoum are responsible for M3's loss of fourteen contracts to Medical Mile, for example, it is unclear why that loss could not be quantified and remedied through an award of money damages.  Similarly, if some of those clients have left M3 never to return, the loss might be greater, but it is still quantifiable—or at least is presumptively quantifiable in the absence of any evidence or explanation offered by M3 to the contrary.

M3 also posits that it has suffered reputational damage and will continue to suffer reputation damage in the absence of injunctive relief, because at least one M3 client raised concerns about Qamoum's emails.  That client wrote, as follows:

> Hey bud,
>
> Here's another one I've never had an exchange with that just blasted to about a dozen people here.  I get that M3 can't keep employees from leaving or going to

---

[6] Although M3 notes that it "did not testify that it has 'hundreds of thousands of clients,'" Dkt. 26 at 19 n.13, it has not contested Warpas's description of its large size, Dkt. 34 at 62–63 (Warpas).

work for competition, but if this person was able to walk with your contact
databased, someone may want to do some competitive intelligence to make sure
they didn't also walk with your panel.

Best,
[redacted]

Dkt. 24-6 at 48.  According to M3's Chief Executive Officer, Anton Richter, this communication

reflects the irreparable, reputational harm caused by Warpas and Qamoum's actions.  Dkt. 24-3

at 9-10 (Richter Dep. 157:14–158:9).  As Richter put it, "the irreparable harm there is that the

client even wrote . . . that we need to take better care of our databases and [should] stop previous

employees from accessing that data and approaching them."  *Id.* at 10 (Richter Dep. 158:3–7).

And, although Richter did not identify any particular panelist, he also testified that some

panelists "complained about unsolicited contact by the defendants."  *Id.* at 11 (Richter Dep.

159:13–14).

These communications undoubtedly came to M3 as an unwelcome surprise, but neither

the communication quoted above nor any other evidence offered by M3 shows that the company

has suffered or is likely to suffer irreparable reputational harm.  To the contrary, the quoted

communication appears to reflect concern for M3's well-being (and not any concern that the

client might have about continuing to do business with the company).  Indeed, if anyone suffered

reputational harm, it was Qamoum (who is most clearly the target of the client's annoyance).

And, although Richter expressed concern that any panelists contacted by Warpas or Qamoum

might be concerned about M3's ability to maintain "secure control" over their personal

information, he conceded that no panelist raised such a concern in "as many words."  *Id.* at 11

(Richter Dep. 159:1–12).  Rather, all he could say is that some complained that they had been

contacted by Warpas or Qamoum.  *Id.* (Richter Dep. 159:13–14).

Richter also testified that M3 will suffer irreparable harm in the absence of a preliminary injunction because it has "invest[ed] significant amounts of money, million[s] of dollars in actually building our communities and our panels so that we can actually conduct surveys," and, therefore, "having the ability to identify . . . friendly panelists" will confer a "significant" and unfair "advantage" on Warpas and Qamoum. *Id.* at 12–13 (Richter Dep. 160:12–161:14). The misappropriation and disclosure of M3's lists of panelists might well constitute irreparable harm. *See Billingham*, 315 F. Supp. 3d at 432–34 (explaining that once confidential information is disclosed, it loses its confidential nature, creating irreparable harm); *Hosp. Staffing*, 736 F. Supp. 2d at 200 (same); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001) (same). The problem with M3's argument, however, is that the company has failed to demonstrate that it is likely to prevail on the merits in showing that Warpas and/or Qamoum misappropriated M3's lists of panelists. Both Warpas and Qamoum, for their part, have denied that "anyone from Medical Mile use[d] any information obtained directly or indirectly from M3 for the purpose of identifying potential panelists." Dkt. 34 at 19; *see also id.* at 67. More importantly, at least at this stage of the proceeding, M3 has failed to offer any evidence that would permit the Court to find that Warpas or Qamoum stole M3's customer lists. Rather, the only relevant evidence is Richter's testimony that some unidentified number of panelists complained about receiving unsolicited communications from Medical Mile, and the redacted emails that Warpas and Qamoum sent out—some of which, at least conceivably, were sent to panelists. This evidence is less convincing than M3's evidence that Warpas and Qamoum contacted M3 clients, and, any uncertainty must be resolved against M3, which bears the burden of proof.

Finally, the Court notes that the risk that M3 will suffer irreparable injury in the absence of a preliminary injunction is mitigated by the passage of time.  Warpas was terminated by M3 in July 2019, and Qamoum quit a month later.  Dkt. 1 at 8, 9 (Compl. ¶¶ 46, 51); Dkt. 24-2 at 27. As a result, their non-compete and non-solicitation covenants would have expired many months ago, were it not for the extension for "any period of violation" and "any period of time required for [M3] to obtain enforcement."  Dkt. 13-2 at 5 (Warpas PIIA § 5, 7) (emphasis omitted); Dkt. 13-3 at 5 (Qamoum PIIA § 5, 7).  Warpas testified, moreover, that he and Qamoum are not "engaged in any . . . outreach for new clients at this point" and that they put a "halt and standstill" to their solicitation efforts "to see what happens with this case."  Dkt. 34 at 40–41 (Warpas).  To be sure, Medical Mile continues to provide services to at least a handful of M3 clients, Dkt. 31 at 6 (sealed), and Warpas expressed a desire to re-institute their business development efforts in the near future, Dkt. 34 at 41 (Warpas).  But, as explained above, the Court is unpersuaded that any losses relating to Medical Mile's current work for M3 clients is unquantifiable, and the Court cannot conclude that the risk that Warpas and Qamoum will again reach out to M3 clients "is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (emphasis, citation, and quotation marks omitted).  Given the Court's conclusions set forth above regarding M3's likelihood of success on the merits, Warpas and Qamoum would need to think long and hard before repeating their (apparent) mistakes of the past, and, to the extent they have paused their efforts "to see what happens with this case," Dkt. 34 at 41 (Warpas), they now have good reason to proceed, if at all, with caution.

The Court, accordingly, concludes that M3 has failed to carry its burden of demonstrating that preliminary relief is necessary to prevent an irreparable loss.  If Warpas and Qamoum

change course, however, and once again approach M3 clients (or panelists) on behalf of Medical Mile, or if discovery reveals additional and more concrete evidence of ongoing, wrongful conduct, M3 can return to the Court and seek emergency relief at that time.

3.      *Balance of Equities and Public Interest*

Given the Court's conclusion that M3 has yet to demonstrate that it will suffer irreparable injury in the absence of preliminary relief, the remaining two factors—the balance of equities and the public interest—merit only brief mention.  M3 alleges that the harm of an injunction to Defendants "pales by comparison" to the risk to M3 absent such relief, because the injunction would leave Warpas and Qamoum free to "advertise in general," "customers and clients [with whom Warpas and Qamoum did not work while at M3] will be free to choose to take their business to" Medical Mile, and, in any event, Defendants brought the harm upon themselves. Dkt. 24-1 at 29.  In the Court's view, M3 understates the harm than an injunction would inflict on Warpas, Qamoum, and Medical Mile (and its clients), and overstates the harm that M3 is likely to suffer in the absence of preliminary relief.  The Court, accordingly, cannot conclude that the balance of harm tips in M3's favor.  Similarly, although the public has an interest in enforcing "contractual agreements" as "necessary for free and fair competition," *id.* at 30 (citation and quotation marks omitted), the Court is unpersuaded that the public has an interest in granting M3 the relief it seeks within the timeframe it proposes.  Particularly given the interests of third parties in receiving stable, predictable services, the Court concludes that the public interest would be served by addressing the myriad issues in this case with a more complete record and with more complete briefing by the parties.

\*   \*   \*

For the foregoing reasons, the Court concludes that M3 has not demonstrated that it is entitled to a preliminary injunction at this time, and the Court will therefore deny M3's motion without prejudice.

## CONCLUSION

The Court, accordingly, will **GRANT** Medical Mile's motion to dismiss, Dkt. 10, and will **DENY** M3's motion for a preliminary injunction, Dkt. 24, without prejudice.  The Court **GRANTS** M3 leave to amend its complaint as to claims against Warpas on or before June 18, 2021.

**SO ORDERED.**

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date:  June 4, 2021